**In the Matter of the WELFARE OF the CHILDREN OF S.E.P. and J.W.P., Parents.**

No. A07–25.

Supreme Court of Minnesota.

Feb. 14, 2008.

## OPINION

MEYER, Justice.

At issue in this appeal is whether substantial evidence existed on the record to support the district court's termination of the parental rights of S.E.P. (mother) to her two young children under Minn.Stat. § 260C.301, subd. 1(b)(5) and (8) (2006). The district court, following a bench trial, terminated father and mother's rights under Minn.Stat. § 260C.301, subd. 1(b)(5) and (8). On appeal, the court of appeals upheld the district court's termination of father's rights, but reversed as to mother. *In re Welfare of Children of S.E.P. and J.W.P.*, No. A07–25, 2007 WL 2245901, at *4 (Minn.App. Aug.7, 2007). We granted the county's petition for review concerning mother's parental rights, and we now reverse the court of appeals and reinstate the district court's termination of mother's parental rights.[1]

The parties in this case are the parents of two daughters who, in May 2006, were 19 and 6 months old. In May 2006, father was charged with malicious punishment of his 19–month–old daughter and ordered to have no contact with mother or the children. Father was arrested after he violated the no-contact order. The children were removed from the home and placed in foster care after mother told a deputy sheriff that she could not care for the children without father's help and the children should be taken away if that would mean father could return. Both parents agreed to and signed case plans, which were approved by the district court. After the parents failed to comply with a number

1. On December 3, 2007, we issued an order, with written opinion to follow, reversing the court of appeals and reinstating the district court's order terminating the rights of both parents.

of the conditions set forth in those case plans, the county petitioned to terminate parental rights.

Father has a history of abusive behavior toward mother. Father hit mother in the arm and grabbed her throat during one argument, and when angry with mother twisted her wrists and pushed her against the wall. Father also yelled profanities at the children, causing mother concern when father lost his temper.

Before he married mother, father resided with his girlfriend A.M., who was pregnant with his child. Father pushed A.M. down repeatedly in an argument during the pregnancy, eventually inducing preterm labor. Shortly after that child was born, father threatened to decapitate the child unless A.M. kept the child quiet. Father later dislocated the elbow of A.M.'s three-year-old daughter from a previous relationship and threatened to sew the girl's mouth shut with wire unless she was quiet. A.M. subsequently obtained a restraining order against father, and he ceased contact with her and her children.

On May 18, 2006, father was watching television when his 19–month–old daughter accidentally spilled his cup of coffee. In response, father screamed at her to "get out of his f* * *ing face" and proceeded to spank her at least five times, loudly enough for mother to hear over the noise of her television from another room of the house. When mother examined her daughter's buttocks, she saw that they were "bright red." Following this incident, the police were called to the residence, and father was arrested and charged with malicious punishment of a child and domestic violence. The children remained in the home with mother.

As a condition of his release from jail, father was ordered to have no contact with mother or his two young daughters. Based on the erroneous advice of his attor-ney, however, father returned home and was subsequently arrested for violating the court order. On May 30, 2006, less than two weeks after the incident, father pleaded guilty to the malicious punishment charge, and as a condition of his probation, he was ordered to have no contact with his wife or children until a further court order allowed such contact.

On the day father was arrested for violating the terms of his release, a sheriff's deputy met with mother at her home. During that visit, mother pushed her older daughter away and refused to feed her younger daughter. When told that father could not reside in the home, mother told the deputy to "take the kids" if that meant that father could return.

The deputy requested that a 72–hour hold be placed on the children, and the children were placed in foster care the same day. Shortly after this incident, the county filed a petition alleging that mother's children were in need of protection or services. At the time the children were removed from the home, they were approximately 20 months and 7 months of age.

Following the removal of their children from their home, case plans were developed for both father and mother. Those case plans were signed by each parent and adopted by the district court. Mother's case plan addressed five general tasks for her to complete. These tasks were to: (1) have "a home and lifestyle free from domestic violence"; (2) complete a parenting capacity assessment and psychological evaluation, and follow all recommendations regarding those evaluations; (3) have "adequate safe and stable housing for herself and her children"; (4) "develop and demonstrate parenting patterns that are age appropriate for her children"; and (5) remain law abiding. Each of these tasks

was in turn divided into a number of discrete subtasks for mother to complete. Among these subtasks were requirements that mother protect her children from abuse, that she not allow father in her home, that she be "open and honest" about father's whereabouts, that she not allow father to have access to her children other than as permitted by court order, that she follow all court orders, and that she participate in in-home services.

Early in July of 2006, mother began in-home parenting education through shared family foster care, but quit the program after only three days. Mother was given another opportunity to participate in shared family foster care, but departed yet again after only a few visits. When given a third opportunity to attend the shared family foster care, mother refused to participate.

During the time mother did attend the in-home parenting education, she showed persistent difficulties with basic parenting skills and lost control of her temper while around her children. When the younger daughter fell, mother did not know what to do for the child's bloody lip. Mother had difficulties watching her children while doing other tasks, such as washing dishes. Mother had no control over the children and eventually stopped helping the foster mother care for them. As for mother's temper, in one instance mother yelled at the foster mother in front of the children, told the foster mother to "shut up," and stated that she did not care and "did not need this crap."

Although mother and father's case plans, as well as numerous court orders, forbade father to reside in her home, the two lived together for a substantial period of time. Father admitted to the court on September 20, 2006, that he had been living with mother for two months in direct violation of court order. Notably, when mother allowed father into her home, father had not yet started the anger counseling ordered by the court. Mother lied to her social worker, to the children's guardian ad litem, and to the district court about her continued residence with father.

Mother indicated at least twice that she did not wish to retain custody of her children. As noted above, she informed the deputy who visited her home after father's arrest that her children should be taken away so that father could return home. At a hearing in September 2006, mother expressed a desire to voluntarily terminate her parental rights and stay with father instead. Although mother changed her mind about voluntarily terminating her parental rights, the district court found that mother "has never conclusively decided she wants to parent her children."

The children's guardian ad litem expressed concerns as to mother's inability to identify dangers to her children, mother's interest in only her own problems, and mother's dishonesty throughout the proceedings. The guardian observed mother to be rough with her older daughter, once squeezing the girl's hand so hard that mother's knuckles turned white. The guardian also stated that mother had to be reminded to feed the younger daughter.

The county social worker assigned to the case agreed that the best interests of the children necessitated a termination of mother's parental rights. She observed that mother places her own needs over those of the children, choosing to reside with father rather than work toward the return of her children. According to the social worker, mother refuses to acknowledge the risk father poses to the children. Nor does mother understand the impact of her own inconsistent behavior on the children.

After mother indicated her desire to voluntarily terminate her parental rights in order to remain with father, the county amended its petition to request termination of mother's parental rights under Minn.Stat. § 260C.301, subd. 1(b)(5) and (8) (2006). Following trial, the district court ordered that both father and mother's parental rights be terminated. The district court found father palpably unfit to parent under Minn.Stat. § 260C.301, subd. 1(b)(4), based on his lengthy history of anger problems and abuse. The court also found that termination of both parents' parental rights was justified under Minn. Stat. § 260C.301, subd. 1(b)(5) (failure to correct conditions leading to out-of-home placement) and (8) (child neglected and in foster care).

On appeal, the court of appeals upheld the district court's determination that father was palpably unfit, but reversed the termination of mother's parental rights on the grounds that it was not supported by substantial evidence. *In re Welfare of Children of S.E.P. and J.W.P.*, 2007 WL 2245901, at *3. In particular, the court of appeals concluded that "substantial evidence does not support the district court's determination that [mother] failed to correct conditions or permitted the children to remain in foster care when her conduct is not at issue." *Id.* at *4. Subsequently, we granted review concerning only the termination of mother's parental rights.

■■■■ We review the termination of parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous. *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn.2001). We give considerable deference to the district court's decision to terminate parental rights. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn.

1996). But we closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn.2005). We affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn.2004), provided that the county has made reasonable efforts to reunite the family, *In re Children of T.A.A.*, 702 N.W.2d at 708.

We consider first whether the district court's findings address the statutory criteria. The district court terminated mother's parental rights after finding that the county had proven by clear and convincing evidence that reasonable efforts had failed to correct the conditions leading to the children's out-of-home placement, Minn. Stat. § 260C.301, subd. 1(b)(5), and that the children were neglected and in foster care, Minn.Stat. § 260C.301, subd. 1(b)(8). Under subdivision 1(b)(5),

it is presumed that reasonable efforts under this clause have failed upon a showing that:

(i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at the time the petition was filed alleging the child to be in need of protection or services, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan;

(ii) the court has approved the out-of-home placement plan required under

section 260C.212 and filed with the court under section 260C.178;

(iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and

(iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

Minn.Stat. § 260C.301, subd. 1(b)(5).

In this case, the children are under the age of eight but had not resided outside the parental home for six months at the time of trial. Nevertheless, section 260C.301, subd. 1(b)(5), further provides that the court may terminate parental rights with respect to a child under age eight even if the child has not been placed outside the home for six months. Therefore, although the statutory presumption does not strictly apply, it may still inform our consideration of whether subdivision 1(b)(5) has been met.

The district court in this case found that mother had agreed to an out-of-home placement plan that was later adopted by the court and that she failed to comply with four separate provisions of the plan. In particular, the district court found that mother failed to "have a home and lifestyle free from domestic violence to provide safe and appropriate care to her children" by exposing her older daughter to emotional abuse by raising her voice and swearing in front of the girl in shared family foster care, and by allowing father to live with her and lying about it to the court and to service providers. The court further found that mother failed to follow the recommendations of her psychologist by choosing not to participate in shared fami-

ly foster care. The court found that mother failed to have adequate safe and stable housing for herself and her children by allowing father to live with her and lying about father's whereabouts. The court found that mother's failure to develop necessary parenting skills through shared family foster care violated her case plan's requirement to develop and demonstrate parenting patterns that were age appropriate for the children. Finally, the court found that the county had made reasonable efforts to rehabilitate mother and reunify the children with her, and that termination of mother's parental rights was in the best interests of the children.

These findings satisfy the criteria for termination of parental rights under subdivision 1(b)(5). Again, although the elements of the presumption of subdivision 1(b)(5) do not strictly apply here because of the length of time the children were in out-of-home placement, they do provide a framework under which to analyze the district court's findings. Considering the district court's findings under that framework, those findings address the statutory criteria, namely, whether the conditions leading to the removal of the children from the home had been corrected as of the time of trial, as well as whether the county made reasonable efforts to correct those conditions, and whether termination is in the best interests of the children.

■ We therefore turn to the question of whether the district court's findings under subdivision 1(b)(5) are supported by substantial evidence and are not clearly erroneous. We conclude, based on our review of the record, that the district court's findings are supported by the requisite substantial evidence and are not clearly erroneous. Mother did indeed fail to comply with the terms of her case plan. Mother refused to complete parenting education, allowed father to continue living

with her, and lied to service providers and the court about her relationship with father, all in direct violation of the explicit provisions of the case plan. We therefore conclude that at least one statutory ground for termination, namely, the failure of reasonable efforts to correct the conditions leading to out-of-home placement under Minn.Stat. § 260C.301, subd. 1(b)(5), is supported by substantial evidence and is not clearly erroneous.

■ The district court found that the county had made reasonable efforts to reunify mother with her children. The district court found that mother was provided with an array of services by the county, including in-home parenting education through shared family foster care, an in-home social worker, group therapy and individual counseling, sessions with the Intervention Program for Women and Invest Early Parenting, and frequent meetings with her assigned social worker. The court found that the services offered to mother were realistic, consistent, timely, available, and accessible. Our review of the record confirms that the district court's findings as to the county's efforts are supported by substantial evidence and are not clearly erroneous.

■ Finally, the district court further found that termination of mother's parental rights was in the best interests of the children. The court found that the children's interests were best served by "the unqualified physical, emotional, and mental commitment that adoptive parents can offer." The court further found that mother's demonstrated lack of parenting skills precluded her from providing stable and age-appropriate parenting for the girls, and that mother was not capable for the reasonably foreseeable future of caring appropriately for the children's ongoing needs. Our review of the record confirms that the district court's findings as to the

best interests of the children are also supported by substantial evidence and are not clearly erroneous.

The court of appeals reversed because it held that the record lacked clear and convincing evidence to support the termination of mother's parental rights. *In re Welfare of Children of S.E.P. and J.W.P.*, 2007 WL 2245901, at *3. But in doing so, the court of appeals made factual findings based on its own review of the record. For example, the court found that "[t]he primary condition in the home requiring correction is [father's] angry and violent conduct," that "most of the conflict between [mother and the foster mother] arose from personality differences," and that mother's "perceived parenting deficiencies were not so significant that the county felt her children would be at risk in her care." *Id.* at *3–4. For the court of appeals to make factual findings such as these is to overstep the bounds of its role as a reviewing court. *See In re Welfare of P.R.L.*, 622 N.W.2d at 543 (reviewing court is to determine whether the district court's findings are supported by substantial evidence and are not clearly erroneous).

Not only was it improper for the court of appeals to make factual findings, but its factual findings are not supported by the record. For example, for the court to say that mother's failure to participate in foster care was the result of "personality differences" improperly minimizes the severity of mother's conduct. While at shared foster care, mother consistently lost her temper around her children, yelled at the foster care provider, refused to take the most nonintrusive of suggestions, and was generally uncooperative. Nothing in this record, however, indicates that the disputes between mother and the foster care provider stemmed from simple differences of personality.

Finally, the conclusions drawn by the court of appeals from its findings of fact are contrary to law. The court's opinion states that mother's "decision to continue living with [father] could not have put the children at risk because the children were no longer in the home." *In re Welfare of Children of S.E.P. and J.W.P.*, 2007 WL 2245901, at *3. It is not clear from this statement whether the court of appeals meant that the district court should not have considered mother's continued residence with father to be a substantial failure to comply with her case plan; whether it meant that, generally, a failure to comply with a court-approved case plan—in this case, mother's continued residence with father—should not be considered when determining whether termination was proper; or whether it meant that this particular case plan should not have required the parents to separate at all. Regardless, each of these interpretations would be erroneous.

First, mother's case plan clearly required her to "have a home and lifestyle free from domestic violence," to "have adequate safe and stable housing for herself and her children," to "have a violen[ce] free home," and to "not allow [father] on the premises or in the home." Continuing to live with someone who, by his own admission, hit and choked her on at least one occasion violated at least four specific requirements of mother's case plan. By any standard, allowing father to continue to live with her was a substantial failure by mother to comply with her case plan.

Second, our statutes and court rules indicate that a court-approved case plan carries with it an imprimatur of reasonableness. Under Minn.Stat. § 260C.201, subd. 6(a) (2006), the responsible social services agency is to prepare a written out-of-home placement plan when the child is placed out of the home; Minn. R. Juv. Prot. P. 41.05, subd. 2(b), requires that, once the court has approved the plan, the court order all parties to comply with it. Also, Minn.Stat. § 260C.301, subd. 1(b)(5)(ii), makes the existence of a court-approved case plan a necessary component of a presumption that reasonable efforts have failed to correct the conditions leading to out-of-home placement. From this, we can conclude that a case plan that has been approved by the district court is presumptively reasonable.[2]

Our rules provide a specific mechanism for the alteration of such plans. Minnesota Rule of Juvenile Protection Procedure 41.06, subd. 4(b), specifically allows a party to request a court review of the reasonableness of the case plan upon a showing of a substantial change of circumstances. We thus conclude that, once a case plan has been approved by the court, the appropriate action for a parent who believes some aspect of the case plan to be unreasonable is to ask the court to change it, rather than to simply ignore it. Given the ability of a parent to seek an alteration of a problematic provision of a case plan, it is improper for a reviewing court to flatly refuse to consider a violation of that case plan when it addresses a termination of parental rights.[3]

2. Arguably, a less-deferential analysis of a case plan or a provision contained therein may be appropriate when that plan imposes requirements having questionable relevance to the conditions leading to a child's out-of-home placement. Because, as we note below, the record presents no such concerns in this instance, we reserve for a later time any dis-

cussion of the impact such circumstances would have on the presumption of reasonableness.

3. While a violation of the case plan cannot be ignored on the basis of the impropriety of the condition violated, such impropriety may be relevant to the ultimate determination under Minn.Stat. § 260C.301, subd. 1(b)(5), regard-

Lastly, this is not an instance in which the requirement that mother not reside with father was arbitrarily imposed or only loosely related to the conditions that led to the children's out-of-home placement. Father pleaded guilty to malicious punishment of one of the children whose custody is at issue here and, by both parents' admission, hit and choked mother on at least one occasion. In addition, it is undisputed that he had a long history of anger problems and abusive behavior. Under such circumstances, a case plan that required mother to have a home free of domestic violence and to not allow father in the home or on the premises was not unreasonable, regardless of whether the children were in the home. If the children were in the home, banning father from the home would have been reasonable as a means of protecting the children from further abuse. But even if the children were not in the home, banning father from the home was reasonable as a means of protecting mother from further abuse and ensuring that she had the ability and the will to establish and maintain a home free of domestic violence.[4]

We therefore reverse the court of appeals and reinstate the district court's order terminating mother's parental rights.

Reversed.

PAGE, Justice (dissenting).

I respectfully dissent. Today, the court rushes to condemn 24-year-old S.E.P. and terminate her parental rights for her failure to comply with a court-ordered case plan, but never accounts for the circumstances surrounding her failure to do so. Both the court's opinion and the district court's findings make clear that the termination of S.E.P.'s parental rights stemmed primarily from her failure to comply with the case plan's requirement that S.E.P. separate from her husband J.W.P. In reviewing the case plan, I have found nothing to suggest that the county provided S.E.P. with support intended to help her separate from J.W.P.[1] Given the apparent

---

ing whether reasonable efforts had actually failed to correct the conditions leading to the child's out-of-home placement. Again, because the facts do not indicate that any provision of the case plan was improperly imposed, we express no further opinion on this matter.

4. The dissent would hold that the district court abused its discretion when it concluded that reasonable efforts were made to assist mother in excluding father from her home. The dissent asserts that the county failed to provide "the emotional, practical, or psychological assistance necessary to make separation from [father] possible." This conclusion runs directly counter to the district court's findings regarding the extensive and case-specific services provided by the county—services that included therapy, shared family foster care, programs through the Advocates for Family Peace, in-home family services, and personal meetings with a county social worker. As we have already noted, the district court's findings are supported by the record and are not clearly erroneous. To engage in

the kind of analysis advocated by the dissent would require that we conduct de novo review, in clear contravention of our established standard of review in termination of parental rights cases.

1. For the court to simply assert that the county provided S.E.P. with "therapy, shared family foster care, programs through the Advocates for Family Peace, in-home family services, and personal meetings with a county social worker" is to completely ignore the issue. The failing here is not in the *number* of services and programs the county provided, but in the record before us. So long as S.E.P. was unable to separate from J.W.P., she could not comply with her case plan. Because the record gives no indication that any of the services and programs identified by the court would have or could have assisted S.E.P. in separating from J.W.P., it cannot be said that "reasonable efforts" were made. For the court to hold otherwise requires it to find facts which simply do not exist in this record.

lack of support provided by the county to meet this requirement, it should come as no surprise that the requirement was not met. S.E.P.'s case plan was doomed from its inception.

Under the best of circumstances, terminating a relationship with a spouse can be difficult, both emotionally and economically, and requires a great deal of support. Given S.E.P.'s history of psychological problems, her young age, her dependency on J.W.P. for economic support, and the trauma necessarily attendant to the removal of her children from her home, S.E.P. was unlikely to successfully end her relationship with J.W.P. without help from the county specifically focused on facilitating the end of that relationship, especially within the compressed time period between the imposition of the case plan and the hearing terminating S.E.P.'s rights. Despite S.E.P.'s background, there is nothing in this record indicating that the county ever provided her with the emotional, practical, or psychological assistance necessary to make separation from J.W.P. possible. By failing to provide S.E.P. concrete assistance in removing J.W.P. from the home and ending her relationship with him, the county effectively ensured that S.E.P. would violate her case plan and lose custody of her children. While it is true that the county worked with S.E.P. to help her develop better parenting skills, such skills would not have assisted S.E.P. in ending her relationship with J.W.P. Moreover, as I understand the record, it is unclear that, absent termination of her relationship with J.W.P., there was any real likelihood that the county's efforts to develop S.E.P.'s parenting skills had any possibility of succeeding.

Perhaps the efforts that the county was obligated to take under the statutory scheme would only have resulted in a delay in the termination of S.E.P.'s parental rights. Nonetheless, it is not our province to ignore the statute's "reasonable efforts" requirement. Because nothing in the record indicates that the county gave S.E.P. any real assistance in ending her relationship with J.W.P. and thereby retaining custody of her children, I respectfully dissent.