*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0938
A16-0939**

In the Matter of the Welfare of the Children of:
K. L. and D. L., Parents.

**Filed November 14, 2016
Affirmed
Johnson, Judge**

Washington County District Court
File No. 82-JV-16-176

Pete Orput, Washington County Attorney, Richard D. Allen, Assistant County Attorney, Stillwater, Minnesota (for respondent county)

Sarah Bashiri, Bashiri Law Office, St. Paul, Minnesota (for appellant-mother K.L.)

Dorothy M. Gause, Dorothy M. Gause, LLC, Stillwater, Minnesota (for appellant-father D.L.)

Jill Idrizow, Stillwater Minnesota (guardian ad litem)

Considered and decided by Johnson, Presiding Judge; Hooten, Judge; and Tracy M. Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

The district court terminated appellants' parental rights to their two children on multiple statutory grounds. We conclude that the district court did not err by finding that a statutory ground for termination exists, by finding that the county provided reasonable

efforts toward reunification, and by finding that termination of parental rights is in the children's best interests. Therefore, we affirm.

**FACTS**

K.L. and D.L. are the parents of J.L., who was born in January 2015, and A.L., who was born in January 2016. K.L. and D.L. became acquainted through online video games and met in-person in California, K.L.'s home state, in March 2014. K.L. moved to D.L.'s home state of Minnesota in April 2014, and they were married two months later. In March 2015, K.L. and D.L. were unemployed and living at the home of D.L.'s mother. K.L. and D.L. were the primary caregivers for J.L. K.L. provided care during the day, and D.L. provided care at night.

In early March 2015, when J.L. was seven weeks old, his primary-care physician referred him to the Midwest Children's Resource Center (MCRC) after observing bruises on his face and head. At MCRC, K.L. told Dr. Mark Hudson, a pediatrician, that J.L. had been irritable when he was picked up under the arms. Dr. Hudson examined J.L. and found a brain hemorrhage and 16 rib fractures in addition to the bruises. Dr. Hudson determined that the rib fractures were inflicted on several occasions. K.L. and D.L. offered innocuous explanations for the bruises, but Dr. Hudson found the explanations implausible. Dr. Hudson concluded that the rib fractures and unexplained bruises "are highly specific for abuse" and that J.L.'s constellation of injuries "is clinically diagnostic of child abuse."

Soon after Dr. Hudson examined J.L., a county child-protection investigator interviewed his parents. D.L. said that he did not abuse J.L. D.L. said that he sometimes became frustrated while caring for J.L. and, on two occasions, had to step outside and

2

scream to release his tension. D.L. admitted that, on one occasion, he squeezed J.L. out of frustration until J.L. made an "audible grunt." K.L. said that she was unaware that D.L. had screamed while caring for J.L. but that she understood D.L. had a diagnosis of Asperger's Syndrome. K.L. offered no information relevant to J.L.'s rib injuries. K.L. also said that she would not end her relationship with D.L. if it turned out that he had caused J.L.'s injuries.

The county placed J.L. in foster care. K.L. and D.L. underwent psychological and parenting evaluations. K.L.'s psychological evaluation revealed defensiveness, insecurity, and dependence on D.L. such that K.L. may not be able to put a child's needs above D.L.'s needs. She was diagnosed with adjustment disorder with mixed anxiety and depressed mood, persistent depressive disorder, and low cognitive functioning. D.L.'s psychological evaluation revealed a long history of mental-health issues dating back to the age of six, including difficulty controlling anger and regulating emotions. D.L. was diagnosed with autism spectrum disorder, generalized anxiety disorder, and persistent depressive disorder. His evaluator was concerned that D.L.'s mental health could put the children at physical and emotional risk. The evaluators recommended individual therapy, couples therapy, and in-home parenting courses in order for K.L. and D.L. to gain insight into what may have caused J.L.'s injuries and to improve their parenting to prevent future abuse.

K.L.'s and D.L.'s attendance in individual therapy was sporadic. K.L. cancelled or failed to attend 13 of her 23 scheduled therapy sessions between August 2015 and April 2016. K.L.'s therapist testified at trial that K.L. had failed to make any significant progress and that her irregular attendance made future progress unlikely. Likewise, D.L.'s

3

attendance in individual therapy was irregular, and his therapist found that he failed to make any progress toward his treatment goals. In addition, K.L.'s and D.L.'s attendance in couples therapy was less frequent than recommended. The couples therapist found that K.L. and D.L. made little progress because they were defensive and unreflecting, and because D.L. often side-tracked therapeutic conversations with in-the-moment issues. K.L.'s and D.L.'s in-home parenting educator described the couple as willing participants and saw some improvements in their parenting. But after 60 hours of work with them, the educator concluded that it would not be appropriate for J.L. and A.L. to return to their parents' care in light of their parents' unresolved issues.

In February 2016, the county petitioned to terminate K.L.'s and D.L.'s parental rights. The county alleged five statutory grounds for termination: that K.L. and D.L. neglected to comply with the duties imposed by the parent-child relationship, *see* Minn. Stat. § 260C.301, subd. 1(b)(2) (2014); that K.L. and D.L. are palpably unfit parents, *see id.*, subd. 1(b)(4); that reasonable efforts by the county had failed to correct the conditions that led to J.L.'s and A.L.'s out-of-home placements, *see id.*, subd. 1(b)(5); that J.L. suffered egregious harm in K.L. and D.L.'s care, *see id.*, subd. 1(b)(6); and that J.L. and A.L. are neglected and in foster care, *see id.*, subd. 1(b)(8).

The district court conducted a three-day trial in April 2016. The county called nine witnesses, including the two individual therapists, the couples therapist, the county child-protection investigator, the county case manager, Dr. Hudson, the couple's psychological evaluator, the in-home parenting educator, and the children's foster mother. Both K.L. and

4

D.L. testified and also called as witnesses K.L.'s mother and a county family-services worker.

In May 2016, the district court issued a 76-page order in which it granted the county's petition to terminate K.L.'s and D.L.'s parental rights. The district court concluded that the county had proved, by clear and convincing evidence, all five of the alleged statutory grounds for termination. The district court also concluded that the county had made reasonable efforts toward reunification and that termination is in the best interests of J.L. and A.L. K.L. and D.L. appeal.

## D E C I S I O N

### I. Grounds for Termination

K.L. and D.L. argue that the district court erred by finding that the county proved, by clear and convincing evidence, the five alleged statutory grounds for termination. K.L. and D.L. argue that the evidence is insufficient to support the district court's findings.

In reviewing such an argument, this court "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). We will affirm a district court's termination of parental rights if "at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests." *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). This court applies a clear-error standard of review to a district court's finding that a petitioner has proved a statutory ground for termination of parental rights. *In re Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn. 1995).

We begin by considering K.L.'s and D.L.'s arguments with respect to the district court's finding that they neglected the duties of the parent-child relationship. A district court may terminate parental rights on that ground if it finds that a parent

> [1] has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and [2] either reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

Minn. Stat. § 260C.301, subd. 1(b)(2) (2014). To grant a petition for termination on this ground, a district court must find that, at the time of termination, the parent is not "presently able and willing to assume his [or her] responsibilities" and that the parent's neglect of these duties "will continue for a prolonged, indeterminate period." *In re Welfare of J.K.*, 374 N.W.2d 463, 466-67 (Minn. App. 1985) (quotation omitted), *review denied* (Minn. Nov. 25, 1985).

In this case, the district court found with respect to the first part of the statute that K.L. and D.L. neglected the duties of the parent-child relationship. The evidentiary record supports the district court's findings of historical fact, and those findings support the district court's ultimate finding. The district court found that D.L. "repeatedly abused J.L." during J.L.'s seven weeks of life in his parents' care. The evidence shows that J.L. suffered 16 rib fractures, bruising on his head and face, and a brain hemorrhage. Dr. Hudson testified that, based on J.L.'s healing patterns, his rib fractures were inflicted on several

6

occasions. The district court found that K.L. knew or should have known that her son had suffered abuse and that she either neglected or refused to ensure J.L.'s safety. The evidence shows that, when J.L. was admitted to the hospital in March 2015, K.L. admitted that J.L. was irritable when he was picked up under his arms and that she had noticed bruising on his face. K.L. also acknowledged D.L.'s quick temper and frustration with the responsibilities of caring for their child.

The district court found with respect to the second part of the statute that, at the time of termination, K.L. and D.L. had failed to gain the insight necessary to correct the conditions that led to the termination petition and were not "close to doing so in any foreseeable future." The evidentiary record supports the district court's findings of historical fact, and those findings support the district court's ultimate finding. The district court found that K.L.'s and D.L.'s individual therapists and their couples therapist were unequivocal that K.L. and D.L. had not made meaningful progress with their case plan. The in-home parenting educator opined that it was not appropriate for J.L. and A.L. to be returned to their parents' care because K.L. and D.L. had unresolved emotional issues and because little progress had been made in developing their co-parenting skills. The evidence shows that the couple struggled to implement basic childproofing measures in their home over a six-month period.

D.L. argues that he did not neglect his duties in the parent-child relationship because he and K.L. took the initiative to schedule their children's appointments. K.L. argues that she did not neglect her parental duties because she participated in every service offered by the county, because she is able to comfort and soothe her son, and because the in-home

7

parenting educator recommended longer, unsupervised visits. These arguments are not responsive to the district court's findings that J.L. suffered serious injuries when he was an infant in K.L.'s and D.L.'s exclusive care, and the arguments do not negate the evidence on which the district court relied in finding that K.L. and D.L. had failed to correct the conditions that led to the termination petition.

Thus, in light of the evidence in the record and the district court's findings, we conclude that the district court did not err by finding that K.L. and D.L. neglected the duties of the parent-child relationship. Because proof of one statutory ground is sufficient, we need not analyze K.L.'s and D.L.'s arguments concerning the other four statutory grounds for termination. *See S.E.P.*, 744 N.W.2d at 385-87 (affirming district court's termination of parental rights after concluding that district court did not err with respect to one of two statutory grounds).

## II. Reasonable Efforts at Reunification

K.L. and D.L. also argue that the district court erred by finding that the county made reasonable efforts at reunification.

If a district court finds that a statutory basis for termination has been proved, the district court also must "ensure that reasonable efforts . . . by the social services agency are made to prevent placement." Minn. Stat. § 260.012(a); *see also S.E.P.*, 744 N.W.2d at 385. The district court must consider whether the services offered by the county were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; (6) realistic under the circumstances." Minn. Stat. § 260.012(h). The county's

8

reasonable efforts "must go beyond mere matters of form so as to include real, genuine assistance." *Matter of Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990), *review denied* (Minn. July 6, 1990). "Whether the county has met its duty of reasonable efforts requires consideration of the length of the time the county was involved and the quality of effort given." *Id.* This court applies a clear-error standard of review to a district court's finding that a county made reasonable efforts to reunify parents with their children. *S.E.P.*, 744 N.W.2d at 387.

In this case, the district court made findings on each of the six factors in section 260.012(h) and ultimately found that the county "has provided more than reasonable efforts seeking to reunify [D.L.] and [K.L] with their children." The district court found that the county's services were relevant to K.L.'s and D.L.'s understanding as to how J.L. came to suffer abusive injuries in their care. The district court also found that the services were adequate because the children were well cared for in foster care, because K.L.'s and D.L.'s case plan was based on recommendations flowing from psychological and parenting assessments, and because no cultural barriers kept K.L. and D.L. from availing themselves of the services. The district court further found that the county offered K.L. and D.L. in-home parenting classes and assistance with transportation to out-of-home services in a timely and consistent manner.

K.L. argues that the district court erred because it did not consider the impact that her troublesome pregnancy with A.L. had on her therapy attendance and her therapist's difficulty in rescheduling appointments. The district court heard testimony about K.L.'s pregnancy, but the evidence is lacking in detail, and K.L. did not testify that the pregnancy

9

was the reason why she missed therapy appointments. It appears that K.L.'s pregnancy did not prevent her from maintaining regular attendance in couples therapy, and the record shows that, even after A.L.'s birth, K.L. cancelled or failed to attend six of ten scheduled individual therapy appointments. K.L.'s contention that it was difficult to reschedule therapy appointments does not excuse her failure to attend 13 of 23 appointments as originally scheduled. K.L. was not employed throughout the relevant time period and did not inform the county of any obstacles to regular attendance in therapy. Both K.L. and D.L. note that, at the time of trial, they continued to work toward completion of their case plan. Those arguments do not call into question the district court's finding that the county made reasonable efforts at reunification.

Thus, the district court did not err by finding that the county made reasonable efforts to reunify K.L. and D.L. with their children.

### III. Best Interests of the Children

K.L. and D.L. last argue that the district court erred by finding that termination of their parental rights is in J.L.'s and A.L.'s best interests.

In a termination-of-parental-rights case, the best interests of the child or children is "the paramount consideration." Minn. Stat. § 260C.301, subd. 7. A district court must make "findings regarding how the order is in the best interests of the child." Minn. R. Juv. Prot. P. 42.08, subd. 1(b). Termination of parental rights is not appropriate, even if one or more of the statutory bases for termination have been proved, if termination is not in a child's best interests. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). In analyzing the best interests of the children, the district court must balance three

factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). Competing interests may include "a stable environment [and] health considerations." *Id.* The district court "must consider a child's best interests and explain its rationale in its findings and conclusions." *In re Tanghe*, 672 N.W.2d 623, 626 (Minn. App. 2003). But the findings need not "go into great detail." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004). This court applies an abuse-of-discretion standard of review to a district court's finding that termination of parental rights is in a child's best interests. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

In this case, the district court found that the intentional injuries inflicted on J.L. "demonstrate a lack of regard for the child's well-being such that a reasonable person would believe it contrary to the best interests of the child or of any child to be in these parents' care." The district court also found that both children's needs have been met in foster care, that they are thriving there, and that the children "have an overriding interest in being raised in a safe, stable and loving home."

Both K.L. and D.L. contend that the district court erred on the ground that it made no specific findings regarding the children's attachment to them and their love for the children. Contrary to these contentions, the district court made findings on those issues. The district court noted that even though K.L. and D.L. "have expressed love and desire to care for their children, their failure to make use of offered services speaks to the depth of

11

that desire." The district court also made findings that addressed the three best-interests factors. The district court also found that, more than a year after recovering from his injuries, J.L. still exhibited signs of distress and maladaptive coping after visits with his parents. The district court further found that A.L. never has resided with her parents.

Thus, the district court did not err by finding that termination of K.L.'s and D.L.'s parental rights is in the children's best interests.

In sum, the district court did not err by granting the county's petition and by ordering the termination of K.L.'s and D.L.'s parental rights to J.L. and A.L.

**Affirmed.**