*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1390**

In the Matter of the Welfare of the Children of: L. D. F., Parent

**Filed February 13, 2017
Affirmed
Ross, Judge**

Hennepin County District Court
File No. 27-JV-16-130

Mary F. Moriarty, Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant mother L.D.F.)

Michael O. Freeman, Hennepin County Attorney, Britta K. Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Department)

Deaundres D. Wilson, Minneapolis, Minnesota (for father C.H., Sr.)

Alex Brusilovsky, Eden Prairie, Minnesota (for guardian ad litem)

Considered and decided by Ross, Presiding Judge; Stauber, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

L.D.F. admitted that her two young sons were in need of protection or services after she returned 24 hours late to retrieve them from their grandmother's care and the grandmother turned them over to child protection workers. L.D.F. also agreed to a case plan ostensibly designed to correct the problem that precipitated the need for services, but

her compliance waned. Over the next year, L.D.F. failed to attend approximately half of her scheduled services opportunities, including therapy, parenting-education classes, and visits with her boys. The county petitioned to terminate L.D.F.'s parental rights, alleging four statutory bases, one of which was the failure to correct the conditions that led to out-of-home placement. The district court concluded that each basis was proved by clear and convincing evidence and that termination is in the children's best interests. L.D.F. appeals and argues that the underlying CHIPS adjudication is invalid and that the termination order is based on insufficient and stale evidence. Because L.D.F.'s admission forecloses our review of the CHIPS adjudication, and because the record supports the district court's findings that reasonable efforts have failed to correct the conditions leading to the children's out-of-home placement, we affirm.

**FACTS**

L.D.F. is the mother of two boys, J.T. and C.H., both under the age of 6. In late October 2014, L.D.F. had arranged for the boys to stay with their paternal grandmother, P.H., but she did not return to pick them up the day she said she would. P.H. contacted Hennepin County Child Protective Services, saying that she could no longer provide for the boys or reach their mother. L.D.F. reached P.H. the next day, within 24 hours of the missed pick-up, but by then the children had been removed to the county's care. The county petitioned the district court to order that the children were in need of protection or services, stating that the boys had been staying with P.H. for most of October 2014 and that L.D.F. had failed to provide diapers and a nebulizer with asthma medication for C.H. It also stated

2

that L.D.F. had no appropriate housing of her own and passed the boys around to different caretakers.

L.D.F. waived her right to contest the CHIPS petition by admitting that, as a result of the October 2014 incident, she had left the boys without proper care and they needed protection or services. Based on the petition and that admission, the district court granted the county's CHIPS petition, and L.D.F. agreed to participate in a case plan.

The plan identified "the safety concerns that make it unable for the child[ren] to be at home." It listed the "[c]oncern by [the grandmother] that [J.T. and C.H.] were being left with people to care for them [while] ongoing plans for their care were not made with the caregivers," and it listed the county's "worr[y] that [L.D.F. and the father] have not provided consistent care . . . and that when [the children] are with other caregivers they [must] have the medication and items needed to care for them." The plan required her to complete a parenting and psychological assessment and follow its recommendations, participate in parenting education, obtain safe and suitable housing, and cooperate with the child-protection workers. The court also granted L.D.F. supervised visits with the boys.

L.D.F. completed the combined assessment in December 2014. The assessor, Dr. Jennifer Dynes, diagnosed L.D.F. with a number of mental-health conditions and recommended that she undergo therapy, consider obtaining a protective order against a former abusive partner, complete parenting education including an in-home component, and meet with a psychiatrist to determine whether medication is appropriate.

L.D.F. initially complied with her case plan and showed signs of progress in therapy. But over time, she faltered in the case plan. She was either late for or failed to attend at

least half of her scheduled services, including visits with the children. She also failed to notify the service providers of her tardiness or absence. Her attendance failures made it difficult for the county to assess her progress.

The county moved to terminate L.D.F.'s parental rights in January 2016, alleging that she failed to comply with the case plan. The district court conducted three days of trial spread out in April, May, and June 2016.

The court heard from L.D.F. and six other witnesses: psychologist Dr. Jennifer Dynes; successive case workers Erin Lysne, James Redmond, and Christine Capehart; parenting educator Danielle Brown; and guardian ad litem Carolyn Bye. The district court also received a letter from L.D.F.'s therapist, Dr. Kathleen Sapp. From these witnesses the district court learned about the removal incident and the initiation of the case plan, including L.D.F.'s positive response to it and her expressed desire to be reunited with her children. The witnesses reported extensively on L.D.F.'s progress on the case plan.

The district court entered thorough findings recounting the witnesses' testimony, and we do not restate the evidence here except in summary fashion.

The case-worker witnesses emphasized L.D.F.'s poor attendance for scheduled therapy sessions, parenting-education sessions, and visits with the children. They testified that for various reasons she missed scheduled therapy sessions, parenting training, and visits with the children roughly half the time. L.D.F.'s attendance inconsistency prevented her from advancing to a home parenting trial and contributed to her unsupervised visitation arrangement being reduced back to supervised visitation. The least favorable testimony came from the last of the successive case workers, Capehart. She testified that L.D.F.'s

4

missed visits negatively affected J.T. and C.H., that J.T. was in therapy for behavior, and that "[J.T.] gets really emotional if he doesn't get a visit." She testified that every time she saw J.T., he was upset that L.D.F. had not visited. The court also learned that L.D.F. failed to secure housing sufficient for her and the children by the time of the trial and that during periods she would stay with friends and relatives.

The guardian ad litem, Bye, gave a particularly unfavorable report. She said that L.D.F. stopped returning calls in September 2015 and that after "a while of not being able to establish contact," Bye no longer initiated contact with L.D.F. She said she had "concerns" about L.D.F.'s ability to care for the boys. She focused substantially on L.D.F.'s failure to attend scheduled visits and to maintain contact with the foster parents. She recounted that twice L.D.F. failed to pick the boys up from daycare without notifying the foster parent. She relayed that it upset J.T. when L.D.F. missed visits. Bye opined that it was in the boys' best interests to stay in foster placement, that they needed stability and consistent caregiving, and that termination served their best interests.

Not all the testimony was unfavorable to L.D.F. The district court learned, for example, that at one point L.D.F. had wisely disregarded the objection of a foster parent and taken C.H. to the hospital rather than return him to the foster parent on schedule. Her good judgment was confirmed by the child's admission to the hospital for two days. And despite L.D.F. missing many parenting-education appointments, Danielle Brown, the parenting educator, testified that L.D.F. seemed motivated to get the boys back ("she was willing to do whatever was necessary"), that her parenting skills were sufficient (L.D.F. "showed adequate amount of love and attention . . . uses proper discipline techniques . . .

5

listened to and attempts to understand her children"), and that she showed improvement (L.D.F. "grew throughout the process"). Pressed about whether she had any concerns that L.D.F. might leave the boys without arranging for adequate care, Brown supported L.D.F., reasoning that "just because she made this mistake in 2014, doesn't mean she'll make this mistake in 2016."

L.D.F. testified, explaining why she had failed to pick the boys up from P.H.'s home on schedule. She said that she occasionally relied on P.H. to watch the boys, at times overnight and eventually full time so L.D.F. would not be "going from house to house with them" while she had no housing. She said she provided food stamps and diapers when she could. She testified that P.H. had never complained that the arrangement was a problem until she involved child protection. And she explained that she could not be reached the day of the incident that led to the CHIPS petition because her phone was dead and its charger was at P.H.'s house. She told the court that she had opted not to pick the boys up because it was too late and too cold for the boys to go outside. By the time L.D.F. charged her phone the next morning, she learned that the boys had been removed after P.H. contacted the county for their removal. L.D.F. speculated that P.H. involved child protection to eventually obtain custody of the boys. She said she had believed that the boys would receive adequate care from P.H. and that she agreed to the CHIPS adjudication and case plan only to prove to social services that she was a fit mother.

L.D.F. believed that she performed the case plan well despite her flawed attendance. She pointed out that her mental health never caused harm to her boys and that she always took them to a safe place if she had mental-health related difficulties, which she said had

6

been lessened by the services she received and the medication she had been consistently taking at the time of trial. She said that a caseworker had visited her apartment (a shared two-bedroom apartment in which L.D.F. occupied one bedroom) without indicating it was insufficient for reunification. She said she had an agreement with the landlord to move her to a two-bedroom apartment when she got her boys back.

L.D.F. testified that she missed visits with the boys because of her mental-health challenges, which she believed she was managing well enough to parent. She detailed her plan to provide for the boys by receiving more benefits and relying on her support network to get the boys to any appointments.

The district court terminated L.D.F.'s parental rights, relying on the testimony of the case workers and the guardian ad litem. It also found that the county made reasonable efforts to reunify L.D.F. and the boys and concluded that L.D.F. failed to comply with her case plan. And it found that termination is in the children's best interests.

L.D.F. appeals.

### D E C I S I O N

L.D.F. challenges the district court's decision to terminate her parental rights. We defer considerably to the district court's decision to terminate a parent's rights. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). The district court may terminate parental rights if clear and convincing evidence establishes that at least one statutory ground for termination exists and termination is in the child's best interests. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). We review the district court's findings of fact for clear error and its determination of a statutory factor's presence

for abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). And our review of termination proceedings is informed by the understanding that courts may terminate parental rights only for "grave and weighty" reasons. *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990); *see also In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995) ("There is perhaps no more grave matter that comes before the court than the termination of a parent's relationship with a child.").

We will address L.D.F.'s challenge to the statutory bases for termination and the district court's best-interests determination.

**I**

L.D.F. prefaces her challenge to the statutory bases for termination with a threshold assertion that the precipitating CHIPS proceedings should never have occurred. She reiterates this claim throughout her appeal, attempting to relate it to the proved statutory bases for termination.

L.D.F.'s challenge to the basis for the CHIPS determination has some theoretical appeal. The record reveals little of the circumstances that led to the county's involvement. But what it does include implies a less than overwhelming case for the CHIPS petition. From a foggy record of that time and from the little testimony reflecting on it, the inciting incident appears to look like this: During a period in which L.D.F. did not have adequate housing, she and P.H. had fallen into a practice in which L.D.F. would leave the boys with P.H. and then return for them. L.D.F. tended to return to retrieve the boys later than she promised. And on the pinnacle occasion at the end of October 2014, after L.D.F. failed

8

(again) to retrieve the boys on the scheduled date, P.H. responded by contacting child-protection workers, telling them that she had inadequate resources to continue caring for the boys and turning the boys over to them. The county therefore removed the boys to a shelter, and L.D.F. contacted P.H. the next day and learned what had happened.

The record at least does not contradict L.D.F's assertion that she elected to leave the boys with a familiar, related caretaker who had a proven history of reliability when L.D.F. could not adequately care for the boys on her own. This seems, as L.D.F. now contends, to have been a responsible decision under her troubles. The juvenile-protection laws are established in part "to preserve and strengthen the child's family ties whenever possible and in the child's best interests, removing the child from the custody of parents only when the child's welfare or safety cannot be adequately safeguarded without removal." Minn. Stat. § 260C.001, subd. 2(b)(3) (2014). At *this* stage of the proceeding, however, lacking a CHIPS trial transcript or more detailed CHIPS findings (findings that were rendered unnecessary because of L.D.F.'s decision to admit the need for services based on the county's CHIPS petition), we cannot know if this situation seriously threatened the health or safety of the boys. The record does inform us that P.H. ran out of diapers and reported that she lacked funds to buy more, and also that she did not have medication or a nebulizer if C.H. were to have an asthma episode. If the county was aware of some genuine risk of harm from this failure-to-arrive situation, it is lost on us in light of the limited record. Although L.D.F.'s failure seems to constitute an inexcusable and inconsiderate affront to P.H.'s assistance, the scant record does not suggest that L.D.F. had reason to think that her failure would put the boys in any jeopardy.

9

In any event, L.D.F. did not put the CHIPS petition to the test in the district court by challenging it, nor did she attempt to begin her present collateral attack on the CHIPS determination during her termination trial. So regardless of any questions we might have as to whether the county's initial removal and subsequent petition meet the high statutory bar (questions the district court also might have had and would certainly have addressed if L.D.F. had initially challenged the county's petition), the merit of the CHIPS determination is not before us, just as it was not before the district court during the termination trial. We therefore turn to the termination decision, beginning with its statutory grounds.

The district court found that clear and convincing evidence proved four grounds for termination of L.D.F.'s parental rights under Minnesota Statutes section 260C.301 (2014): (1) that L.D.F. failed to comply with the duties imposed by the parent-child relationship under section 260C.301, subdivision 1(b)(2); (2) that L.D.F. is palpably unfit to be a party to the parent-child relationship under subdivision 1(b)(4); (3) that reasonable efforts failed to correct the conditions leading to out-of-home placement under subdivision 1(b)(5); and (4) that J.T. and C.H. are neglected and in foster care under subdivision 1(b)(8).

We may affirm even if only one statutory ground is supported. *See R.W.*, 678 N.W.2d at 55. We focus on subdivision 1(b)(5), which provides that the district court may terminate parental rights if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." We presume that reasonable efforts failed to correct conditions if four circumstances occurred: (1) a child has resided out of home for 12 of the preceding 22 months; (2) the court approved the case plan; (3) the conditions leading to a child's out-of-

home placement have not been corrected; and (4) reasonable efforts have been made by the social services agency to reunite the family. Minn. Stat. § 260C.301, subd. 1(b)(5)(i)–(iv). We presume the third element on a showing that the parent has not substantially complied with the court's orders and a reasonable case plan. *Id.*, subd. (1)(b)(5)(iii). And in the case of a child under age eight, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the case plan. *Id.*, subd. 1(b)(5)(i).

The district court had little choice but to find that L.D.F. had not corrected the conditions that led to removal and that the presumptive factors had been satisfied. On the presumptive factors, the record plainly shows that J.T. and C.H. had been in foster care for far more than six months by the time of the termination trial, that the court approved L.D.F.'s case plan (which arose from the prior CHIPS proceeding), and that L.D.F. had not substantially complied with her case plan because she failed at least half the time to attend her scheduled therapy, parenting training, and visits with the boys.

L.D.F. argues that the district court's findings about her case plan performance are contrary to the testimony and that the district court understated her progress in therapy and parenting education. The district court's findings that L.D.F. failed to consistently attend therapy, visitation, and parenting education are supported by the record. Dr. Sapp's letter reported an approximately 50% attendance rate, and Capehart testified that L.D.F. attended therapy only once in 2016. Both Redmond and Capehart testified to a similar or worse rate for L.D.F.'s visitation attendance.

11

L.D.F. focuses on her progress rather than her attendance. The problem with her focus is that it overlooks the fact that it was her lack of attendance that precipitated the CHIPS petition and her consequent admission to the CHIPS adjudication and the case plan. The district court's focus on L.D.F.'s failure to correct her poor and sporadic attendance therefore demonstrates that it recognized the most relevant measure of her progress under the case plan. As to L.D.F's missed visits with the boys, the trial testimony (including L.D.F's) consistently emphasized that her ongoing failure to arrive as scheduled deeply and negatively affected the boys emotionally. And as to her missed therapy sessions, L.D.F. acknowledged the importance of therapy and expressed that she knew her mental-health difficulties directly and negatively influenced her poor visitation attendance. L.D.F.'s argument that the district court elevated attendance over substance fails in this unique case where the attendance was the substance based on a conceded CHIPS proceeding.

L.D.F. also argues that the district court relied on stale evidence by referring to the initial psychological-parenting assessment and her attendance throughout 2015. But this evidence is a necessary benchmark to measure L.D.F.'s 2016 progress. Capehart testified about L.D.F.'s attendance at visitation and therapy in 2016. The comparative evidence tends to show whether L.D.F. had improved her attendance from the 50% rate she demonstrated throughout 2015. It revealed that she had not. We see no error here.

L.D.F. contends that the county did not make reasonable efforts toward reunification. She argues that the child-protection department dedicated its efforts toward termination, not reunification. She concedes that her case plan was reasonable, but she

12

contends that "none of the case workers kept track of [or] pursued information from" Brown, Dr. Dynes, or Dr. Sapp to judge accurately how she was progressing.

L.D.F. is correct that, to terminate her parental rights, the district court had to make specific findings that the county made reasonable efforts to rehabilitate her and to reunite the family. *See* Minn. Stat. § 260C.301, subd. 8(1). "When determining whether reasonable efforts have been made," the district court must consider "whether services to the child and family were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). "Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *review denied* (Minn. Mar. 28, 2007). A court should consider "the length of the time the county was involved and the quality of effort given." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 88 (Minn. App. 2012) (quotation omitted). This court applies a clear-error standard of review to a district court's finding that reasonable efforts were made to reunify a parent and a child. *See S.E.P.*, 744 N.W.2d at 387.

The district court's findings that the department made reasonable efforts toward reunification have sufficient record support. The findings recite the case plan accurately, discuss the issues the case plan meant to address (L.D.F.'s inconsistency, mental health, and housing), list correctly the referrals and services that the department provided for L.D.F., explain thoroughly how L.D.F. failed to complete her case plan, and describe

13

accurately the county's efforts to find a permanent placement option. Although the plan did not successfully result in reunification, it was reasonably directed toward that end. Most salient, the therapy services were designed in part to address L.D.F.'s mental-health issues, which, she admitted, contributed to her attendance failures. And it is easy to infer from the termination order that, but for L.D.F.'s unimproved chronic attendance failures, the district court almost surely would not have ordered termination.

L.D.F.'s unreasonable-efforts argument focuses on the county's lack of communication, not on a lack of reasonable services. And her off-point argument is not supported by the record. She asserts that the case workers failed to consult with one another or with the service providers. But each case worker indicated that he or she reviewed the case file independently, communicated with L.D.F., and received ongoing reports from the service providers. True, not all the case workers spoke in person with all the service providers. But L.D.F. does not establish how the lack of this type of communication renders the efforts unreasonable. The record also contradicts L.D.F.'s contention that the county failed to provide adequate housing services. The case workers testified that when they offered housing services, L.D.F. told them she had found housing on her own. The district court's finding that the department made reasonable efforts is not clearly erroneous.

While we are not unsympathetic to L.D.F.'s contention that her initiating late arrival to pick up the boys from a caretaker-relative should not have triggered a CHIPS petition and that the case plan was overly broad in light of her limited parenting deficiency, we repeat that the CHIPS petition and adjudication went uncontested and are not before us for review. Focusing only on the condition that led to out-of-home placement, the district court

14

reasonably saw that L.D.F. displayed a similar failure to arrive at scheduled, court-ordered services and visits with her boys for more than a year and that her remarkably poor attendance did not improve even after the contested permanency proceedings began. The record supports these findings, and the district court did not abuse its discretion by concluding that the county proved subdivision 1(b)(5) by clear and convincing evidence.

Because we can affirm on one statutory basis, we decline to analyze the others. We move to the best-interests determination.

**II**

L.D.F. challenges the district court's finding that termination of her parental rights is in the children's best interests—a finding necessary for termination. *See* Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). The best interests of the children become the paramount consideration if one of the statutory bases is proved. Minn. Stat. § 260C.301, subd. 7. We review a district court's finding that termination is in the children's best interests for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905. Our deference to the district court on this finding exists in part because it involves credibility determinations, which are best left to the district court. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003).

L.D.F. again claims that the district court based its finding on "the erroneous perception that [L.D.F.] did not consistently or sufficiently pursue her case plan." We have already addressed the argument in our statutory-factor analysis, and we do not revisit it here. We are satisfied that the district court met its pre-termination duty to specifically find that termination is in the children's best interests by analyzing "(i) the child's interests in preserving the parent-child relationship; (ii) the parent's interests in preserving the parent-

15

child relationship; and (iii) any competing interests of the child." Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). "Competing interests" include factors like stable environments, which L.D.F. failed to provide for the boys, and health considerations, which include the emotional and mental health that L.D.F.'s failures negatively impacted. *See In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). We have no basis to unsettle the district court's supported finding that J.T. and C.H.'s need for stability and a consistent caregiver outweigh any interest L.D.F. has in custody. The district court recognized that the boys loved L.D.F. and that L.D.F. loved the boys. But it observed that the boys have mental-health and medical needs that L.D.F. cannot consistently accommodate. Given L.D.F.'s inability or proven lack of commitment to sufficiently attend to the boys' needs personally, the district court had no reason to believe she would make sure J.T. would receive the therapy he needs or that C.H. would receive the attention his medical condition requires.

L.D.F. also attempts to highlight inconsistencies and deficiencies in the guardian ad litem's testimony and experience. We cannot address this argument or the district court's reliance on the testimony without reweighing competing evidence, a task we do not undertake on appeal. *See R.T.B.*, 492 N.W.2d at 4.

The best-interests evidence supports the conclusion that L.D.F. did not substantially improve her stability or increase her ability to be present and attentive to the boys' needs. Despite reasonable questions about the seemingly thin grounds for the county's initial involvement, we have no doubt in the district court's thorough and careful findings or that its reasoned analysis and result are sufficiently grounded in the law.

**Affirmed.**