Jeremy Blackwelder, Holmstrom & Kvam, PLLP, Granite Falls, Minnesota (for appellant-father G.J.F.)
Curtis Reese, Olivia, Minnesota (for appellant-mother A.M.C.)
David Torgelson, Renville County Attorney, Laurence Stratton, Assistant County Attorney, Olivia, Minnesota (for respondent Renville County)
Jan Tonn, Wood Lake, Minnesota (guardian ad litem)
Considered and decided by Bratvold, Presiding Judge; Rodenberg, Judge; and Jesson, Judge.
OPINION
RODENBERG, Judge
In these consolidated appeals from the termination of the parental rights of both parents, we consider whether and under what circumstances a noncustodial parent who is not a party to a CHIPS proceeding is entitled to appointed counsel. Under the plain language of Minn. Stat. § 260C.163, subd. 3(c)[1] , all parents who desire and are unable to afford counsel are entitled to appointed counsel in any case in which the *653 district court "feels that such an appointment is appropriate." Because the district court did not reversibly err in terminating the parental rights of both parents, we affirm.
FACTS
Appellant-parents A.M.C. (mother) and G.J.F. (father) are the parents of N.F., who was born in 2008. Father is the adjudicated father of N.F. by way of a Recognition of Parentage. The parents were never married, but lived together for approximately ten years. During that time, they shared in parenting N.F. They separated in 2015, after which mother became N.F.'s custodial parent.
Renville County Human Services (county) became involved with the family after it received a report from N.F.'s school that N.F. had come to school in cold weather without a winter coat, hat, or mittens. Following that report, the county unsuccessfully attempted to locate mother and father. The county discovered that N.F. had been living with a maternal aunt and uncle because mother had been evicted from her residence and was homeless. Aunt thought that mother may be abusing prescription medications or using methamphetamine. Father had been released from jail and was thought to be living in Olivia, but the county could not locate him.
The county filed a petition alleging N.F. to be a child in need of protection or services and requested an emergency protective care (EPC) hearing. After the EPC hearing, the district court found that N.F. was in need of emergency protective care and granted temporary custody of N.F. to the county.
In December 2015, at the admit/deny hearing on the CHIPS petition, mother admitted the petition. Mother testified that she was using drugs, needed drug treatment, and was then unable to adequately parent N.F. She also told the district court that she had mental health issues and that she was homeless. The district court adjudicated N.F. to be a child in need of protection or services.[2]
Father attended the admit/deny hearing in the CHIPS case, and requested court-appointed counsel. The district court denied father's request. The district court reasoned that, because father was a noncustodial parent, he was not a party to the proceedings and was therefore not entitled to appointed counsel. The district court told father that, although it would not appoint counsel, father could hire a private attorney. Father also asked to become a party, but the district court denied this request. At a later hearing in February 2016, father again requested to intervene as a party. The district court again declined to make father a party.[3]
Over the next two years, and because of father's repeated incarceration, and his resulting unavailability to parent, the county focused its reunification efforts on mother. The county developed three out-of-home placement plans (OHPP) with mother. It sought out and assisted mother in finding treatment and housing on multiple occasions. Mother successfully completed inpatient treatment and was making progress for a time. N.F. remained in foster care, but frequently visited mother and was beginning to have overnight visits with mother at the treatment facility. Mother's progress stalled when she relapsed. The county continued to assist mother, but mother *654 became unresponsive to the county's efforts. Mother was not drug testing in compliance with the county's instructions. When she did test, she often tested positive for nonprescribed drugs. The county attempted to hold meetings with mother, but mother often missed meetings.
During this same time, father was incarcerated for a variety of crimes in multiple jails in Minnesota and Wisconsin. At one point, he requested execution of a stayed prison sentence. The district court found that this amounted to "a decision which [father] knew would render him unavailable to participate in this proceeding." The county was unable to stay in contact with father during these multiple incarcerations.
N.F. remained in foster care during all of this. While in foster care, N.F. made academic progress and was thriving with a foster family.
In August 2017, the county filed a petition seeking termination of the parental rights (TPR) of both parents. Both parents opposed the petition. Father was provided with appointed counsel for the termination proceedings. Following a trial on the TPR petition, the district court terminated the parental rights of both parents.
These consolidated appeals followed.
ISSUES
I. Did the district court abuse its discretion in terminating mother's parental rights?
II. Is father entitled to reversal of the termination of his parental rights because the district court declined to appoint counsel for him in the CHIPS case?
III. Did the district court abuse its discretion in terminating father's parental rights?
ANALYSIS
I. The record supports the district court's termination of mother's parental rights.
Whether to terminate parental rights is discretionary with the district court. In re Welfare of Child of R.D.L. , 853 N.W.2d 127, 136 (Minn. 2014). "We review the district court's findings in a TPR proceeding to determine whether they address the statutory criteria for termination and are not clearly erroneous ... in light of the clear and convincing standard of proof." In re Welfare of Children of K.S.F. , 823 N.W.2d 656, 665 (Minn. App. 2012). "A finding is clearly erroneous if it is manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." Id . (annotation omitted). "We defer to the district court's decision on termination if at least one statutory ground for termination is supported by clear-and-convincing evidence and termination is in the children's best interests." Id ."A district court abuses its discretion if it improperly applies the law." In re Welfare of Child of J.K.T. , 814 N.W.2d 76, 93 (Minn. App. 2012)
A. Mother does not challenge the district court's findings of statutory grounds to terminate her parental rights.
Mother does not challenge the district court's findings of the existence of multiple statutory grounds to terminate her parental rights. Nevertheless, in this case, we will invoke our discretion to briefly consider whether the evidence is sufficient to clearly and convincingly establish a statutory basis for termination under Minn. Stat. § 260C.301 (2016).[4] See *655 Minn. R. Civ. App. P. 103.04 (stating that appellate courts may address any question in the interests of justice).
Among other statutory grounds, a district court may terminate parental rights if it finds that a parent has "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship." Minn. Stat. § 260C.301, subd. 1(b)(2). Parental duties include, but are not limited to, "providing the child with necessary food, clothing, shelter, education and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able." Id . The district court must also determine that, at the time of termination, the parent is not presently able and willing to assume her responsibilities and that the condition will continue for the reasonably foreseeable future. See In re Welfare of J.K. , 374 N.W.2d 463, 466-67 (Minn. App. 1985), review denied (Minn. Nov. 25, 1985).
Here, the district court found that mother has substantially, continuously, or repeatedly refused or neglected to comply with her parental duties "by failing to remain sober and continuing the use of controlled substances." This is well-supported by the record. N.F. has been in foster care since December 2015, and mother was not caring for N.F. before removal. Mother has continued to struggle with drug use despite multiple opportunities for treatment. Mother's relapses and continued use of controlled substances prevented her from parenting or even meaningfully interacting with N.F. through visits and phone calls. The record supports the district court's findings concerning this statutory basis for termination, and the district court acted within its discretion in finding that a statutory basis for termination of mother's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2) was proved.
B. The record supports the district court's finding that the county made reasonable efforts to reunify N.F. with mother.
Mother argues that the services offered her were not reasonable. Specifically, she argues that the county lacked knowledge concerning her mental-health issues and that the county did not monitor or incorporate her mental-health treatment and therapy into its reunification plan.
In most TPR cases, the petitioner must show clear and convincing evidence that reasonable efforts were made to reunite the parent with the child. In re Children of T.A.A ., 702 N.W.2d 703, 708 (Minn. 2005). Minnesota law requires the district court to find whether "reasonable efforts to finalize the permanency plan to reunify the child and the parent were made." Minn. Stat. § 260C.301, subd. 8(1). A district court must make specific findings as to whether the county provided reasonable efforts to rehabilitate the parent and to reunify the child and parent. Minn. Stat. § 260.012(h) (2016).
The district court must also consider whether the services provided were: "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Id. "Whether the county has met its duty of reasonable efforts requires consideration of the length of the time the county was involved and the quality of the effort given."
*656 In re Welfare of H.K. , 455 N.W.2d 529, 532 (Minn. App. 1990), review denied (Minn. July 6, 1990).
Here, the district court found that, following N.F.'s out-of-home placement, reasonable efforts failed to correct the conditions leading to N.F.'s placement. The district court specifically found that the county (1) provided mother with multiple opportunities for treatment for her chemical dependency, (2) provided transportation for mother to visit with N.F., (3) found housing for mother and provided transportation once that housing was located, (4) set up a family-group-decision-making conference to assist mother with ways to succeed in her treatment despite multiple relapses, and (5) recommended several extensions in the time N.F. could remain in foster care without a permanency determination to allow mother to continue working toward reunification. The record supports these findings.
A case manager was appointed to mother's case and a case plan was generated. Mother did not comply with the case plan. The case plan appropriately targeted reunification efforts on mother's history of drug addiction and homelessness. From December 2015 until the termination trial in November 2017, the county continued to arrange for treatment, housing, and other services for mother.
After N.F. was placed in foster care, the county explained to mother what she needed to do in order for N.F. to return home. She needed to complete a rule 25 chemical-use assessment and follow all recommendations, abstain from chemical use, submit to random drug testing, stay in contact with the county, and meet regularly with the county to review progress. Mother did take a chemical-use assessment, which recommended that she go into inpatient treatment.
By early 2016, the county had helped mother find and enter inpatient treatment. Mother was then visiting N.F. on a regular basis. Mother was successfully discharged from the inpatient portion of the program, and the county made arrangements for her to go to a halfway house, Journey Home, for additional services.
While at the halfway house, mother had five overnight visits with N.F. But mother twice relapsed on methamphetamine during August 2016. Undeterred, and still looking to reunify N.F. with mother, the county arranged for mother to go to another inpatient treatment program, Recovery Plus.
By November 2016, mother had completed the inpatient treatment at Recovery Plus and was admitted back to Journey Home. The county anticipated that mother would be successfully discharged in January 2017, and continued to meet with her regarding her progress. But mother was discharged from Journey Home in January 2017 for not making adequate progress. Mother then moved to Brainerd to live with her sister.
The county located a drug-testing facility in the Brainerd area so that mother could work on her case plan. Mother began to refuse testing and repeatedly failed to show up to test. She eventually tested positive for methamphetamine several times.
Even after that, in April 2017, the county found mother yet another residence in a long-term homelessness program. The county coordinated and provided transportation for mother's relocation to the new residence, and a case manager there assisted mother with coordinating services and looking for work. The county remained involved with mother's case plan.
In May 2017, mother reported to the county that she had again relapsed. Mother sought out another outpatient relapse-recovery facility, which she attended twice *657 per week. In July 2017, mother was discharged from the outpatient treatment program for poor attendance, for not attending Narcotics Anonymous (NA) meetings, and for not seeking out a sponsor. Mother tested positive for amphetamine three times in July 2017.
The county social worker saw a decline in mother's compliance with services from summer 2017 up to the termination trial. The county arranged a family-group-decision-making meeting with mother in July 2017 to assist mother with finding treatment options. Mother became confrontational and left the meeting early. The county's efforts to assist mother with her addiction issues were not only reasonable; the efforts were herculean, but were ultimately unsuccessful.
Mother also argues that the county's efforts were not reasonable because they failed to address mother's mental-health concerns. The county did not specifically include mental health in mother's case plan because mother was already seeing a psychotherapist. The focus of the county's efforts was, for obvious reasons, mother's profound and recurring chemical dependency. The county's efforts were interrupted by mother's repeated relapses and failures to submit to drug testing. This record amply supports the district court's determination that the county made reasonable efforts to reunify N.F. with his mother.
C. The district court did not abuse its discretion in finding that termination of mother's parental rights is in N.F.'s best interests.
Mother also challenges the district court's finding that termination is in N.F.'s best interests. In a TPR case, the best interests of the child "must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7. "Even if a statutory ground for termination exists, the district court must still find that termination of parental rights ... is in the best interests of the child." K.S.F. , 823 N.W.2d at 668.
In analyzing a child's best interests, the district court must balance three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." In re Welfare of R.T.B. , 492 N.W.2d 1, 4 (Minn. App. 1992). We apply an abuse-of-discretion standard of review to a district court's conclusion that termination of parental rights is in a child's best interests. In re Welfare of Children of J.R.B. , 805 N.W.2d 895, 905 (Minn. App. 2011), review denied (Minn. Jan. 17, 2012).
The district court made findings on each of the relevant factors. It considered mother's chemical-dependency issues, her unstable housing situation, and the fact that N.F. has been successful while in foster care. These are all valid considerations.
N.F. has been in foster care since December 2015. The district court noted that N.F. gets along well with the foster family and that the foster home provides him with a safe, stable, and happy home. Mother's inconsistent visits and unrelenting use of controlled substances have rendered her unavailable to N.F. N.F.'s foster parent testified that it became normal for mother to miss visits, and that when mother cancelled visits, N.F. stated "good," because N.F. "didn't want to go anyway."
The district court also credited trial testimony that N.F. needs stability at home and in school because N.F. meets the statutory definition for Severe Emotional Disturbance (SED) and Emotional Disturbance (ED). The record supports this finding. Over the course of the last two years while in foster care, N.F.'s behavior *658 improved and he has made academic progress.
Moreover, there is ample evidence in the record to support the district court's conclusion that mother is in no position to care for N.F. in the reasonably foreseeable future. The district court acted within its discretion in finding that N.F.'s best interests would be served by terminating mother's parental rights.
II. The district court's basis for declining to appoint counsel for father in the CHIPS proceeding was contrary to the plain language of Minn. Stat. § 260C.163, subd. 3(c), but the error does not warrant reversal of the termination of father's parental rights.
Father argues that the district court improperly denied him his right to appointed counsel in the CHIPS case, and argues that this denial of counsel violated his rights under the due-process and equal-protection clauses of the United States and Minnesota Constitutions. He also argues that we should reverse the termination of his parental rights because the district court misinterpreted and misapplied the Minnesota statutes and rules pertaining to appointment of counsel for parents in a CHIPS proceeding.
As discussed in more detail below, we undertake consideration of father's improper-denial-of-counsel arguments understanding that father's complaint arises from the CHIPS proceeding, and not from this TPR case. Father had the assistance of appointed counsel in the TPR trial and on appeal. Despite father's arguments arising from the district court's decision in the CHIPS proceeding, we think the two proceedings sufficiently related that father's present challenge should not be regarded as an impermissible collateral attack on the district court's orders in the CHIPS case. See, e.g. , Henderson v. Kibbe , 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (discussing, in the context of a federal habeas corpus proceeding, a limited circumstance in which a state court's final judgment may be collaterally attacked); Bode v. Minn. Dep't of Nat. Res. , 612 N.W.2d 862, 866-68 (Minn. 2000) (discussing the circumstances in which a judgment may be collaterally attacked). We therefore address father's argument on its merits.
A. The district court's denial of appointed counsel to father in the CHIPS case did not violate father's constitutional rights.
First, father argues that the district court's denial of appointed counsel violated the Equal Protection Clause of the United States Constitution because he is similarly situated to other noncustodial parents in CHIPS cases in Minnesota who are provided with appointed counsel.
The Equal Protection Clause mandates that similarly situated individuals be treated alike. See U.S. Const. amend XIV, § 1. Father produced no evidence to the district court which supports his argument that he was treated differently than others similarly situated. See R.D.L. , 853 N.W.2d at 132 ("We have required that a party establish that he or she is similarly situated to persons who have been treated differently in order to support an equal protection claim."). We do not address father's equal-protection argument further, because the issue is inadequately briefed and because we see no basis in this record for an equal-protection challenge.[5]
*659 Second, Father argues that the district court violated his due-process rights under both the United States and Minnesota Constitutions when it did not appoint counsel for him during the CHIPS proceedings.
An indigent parent has no federal constitutional due-process right to counsel in a TPR proceeding. Lassiter v. Dep't. of Soc. Servs. , 452 U.S. 18, 31-32, 101 S.Ct. 2153, 2161-62, 68 L.Ed.2d 640 (1981). The Minnesota Supreme Court has not determined that the Minnesota Constitution provides parents a due-process right to appointed counsel in a CHIPS case.
Moreover, Minnesota affords parents a statutory right to court-appointed counsel in CHIPS and TPR proceedings. Minn. Stat. § 260C.163, subd. 3(c) (Supp. 2017); see also Minn. R. Juv. Prot. P. 25.02, subd. 2. The district court did appoint counsel for father during the termination proceedings. We therefore turn to father's claim that the district court erred under Minnesota statutory law when it declined to appoint counsel for him in the CHIPS case.
B. The district court erroneously based its denial of appointed counsel for father on the fact that father was not a party to the CHIPS case.
Father argues that the termination of his parental rights should be reversed because the district court's denial of appointed counsel during the CHIPS proceedings was based on an error of law.
"Statutory interpretation is a question of law that we review de novo." In re Welfare of Children of J.B. , 782 N.W.2d 535, 539 (Minn. 2010). "Our goal in statutory interpretation is to ascertain and effectuate legislative intent." Id. ; see also Minn. Stat. § 645.16 (2016). "If a statute is unambiguous, we interpret the text of the statute according to its plain language." J.B. , 782 N.W.2d at 539.
Minn. Stat. § 260C.163 (Supp. 2017) guides the district court's appointment of counsel in CHIPS proceedings. See Minn. R. Juv. Prot. P. 25.02, subd. 2 (noting that appointment of counsel for a parent of a child who is the subject of a child-protection matter "shall be pursuant to Minnesota Statutes § 260C.163, subd. 3(a)-(g)"). The statute provides that "[t]he child, parent, guardian or custodian has the right to effective assistance of counsel in connection with a proceeding in juvenile court as provided in this subdivision." Minn. Stat. § 260C.163, subd. 3(a). "Parent" means "a person who has a legal parent and child relationship with a child which confers or imposes on the person legal rights, privileges, duties, and obligations." Minn. Stat. § 260C.007, subd. 25(a) (2016). A legally recognized parent and child relationship is established between a child and a father when, as here, there has been an adjudication of paternity. See Minn. Stat. § 260C.007, subd. 25(b)(2)(i)-(vii) (2016).
Appointment of counsel for parents in child-welfare cases is, as noted above, governed by statute.
Except in proceedings where the sole basis for the petition is habitual truancy, if the parent, guardian, or custodian desires counsel but is unable to employ it, the court shall appoint counsel to represent the parent, guardian, or custodian in any case in which it feels that such an appointment is appropriate if the person would be financially unable to obtain counsel under the guidelines set forth in section 611.17.
Minn. Stat. § 260C.163, subd. 3(c) (emphasis added). Court-appointed counsel shall be at the county's expense. Id ., subd. 3(h).
Minn. Stat. § 260C.163 does not define *660 "appropriate."[6] Neither does the statute provide standards or factors that a district court should apply or consider.
When statutes explicitly entrust the district court to determine what is appropriate, we review for an abuse of discretion. In re Welfare of J.J.P. , 831 N.W.2d 260, 269 (Minn. 2013) (stating that statutory language authorizing a district court to act when "it deems advisable" grants the district court discretion to determine when expungement of an order adjudicating the juvenile delinquent is appropriate). In such cases, we will not conclude that a district court has abused its discretion absent a resolution of the question that is against logic and the facts of record. Rutten v. Rutten , 347 N.W.2d 47, 50 (Minn. 1984) ("There must be a clearly erroneous conclusion that is against logic and the facts on record before this court will find that the trial court abused its discretion.").
Here, the district court denied father appointed counsel because, under the Rules of Juvenile Protection Procedure, father was not a party. Those rules make a distinction between parties and participants. See Minn. R. Juv. Prot. P. 21.01 - .02. Under the rules, a noncustodial parent is a participant. Parties have extensive rights to actively take part in the proceedings, while participants are only entitled to notice, to receive a copy of the petition, and to attend hearings. Compare Minn. R. Juv. Prot. P. 21.02 (parties' rights) with Minn. R. Juv. Prot. P. 22.02, subd. 1 (participants' rights). The rules also allow for a participant to become a party by intervening under rule 23. Minn. R. Juv. Prot. P. 21.01, subd. 1(e), 22.02, subd. 1. A parent may intervene as a matter of right, on motion duly made. Minn. R. Juv. Prot. P. 23.01, subd. 3, .03, subd. 1.
Minn. Stat. § 260C.163, however, makes no distinction between parents who are parties and parents who are participants. To like effect, the rule concerning appointment of counsel for parents does not distinguish between parents who are parties and parents who are participants. Minn. R. Juv. Prot. P. 25.02, subd. 2. The rule neither requires nor suggests that a parent must be a party before he may have appointed counsel. See id. As discussed, the statute allows for the district court to appoint counsel for any indigent parent when the district court feels that it would be appropriate . And it is undisputed that father is an adjudicated parent of N.F. Because the district court misapplied the law, it abused its discretion. J.K.T. , 814 N.W.2d at 87.
C. The district court's denial of counsel to father in the CHIPS case, which was not appealed, does not constitute grounds to reverse the termination of father's parental rights.
Despite the district court's denial of appointed counsel for father in the CHIPS case based on father's status as a participant, we decline to reverse the termination of father's parental rights for at least three reasons. First, and as noted, there was no appeal or petition for prohibition or mandamus from the district court's orders in that file. Second, and on this record, the district court could have declined to appoint counsel for father in the CHIPS case had it felt, as it seems it may have felt, that appointment of counsel *661 would be inappropriate for a parent who is repeatedly incarcerated, unavailable to care for the child, and marginally interested in working a case plan. Third, the paramount best interests of N.F. would not be advanced by further delay of a safe and permanent placement for him.
The CHIPS case was a proceeding in district court separate from this TPR case. The record is clear that, until the summer of 2017, the plan in the CHIPS file was to return N.F.'s custody to mother. N.F. has been in foster care since December 2015, and, despite N.F.'s out-of-home placement having exceeded 12 months, the plan until August 2017 was that N.F. would and could be successfully returned to mother. See Minn. Stat. § 260C.503, subd. 1 (2016) (requiring permanency proceedings for children placed out of home for 12 months except in certain circumstances).[7] There was no appeal from the district court's determination that N.F. was in need of protection or services, nor did father seek relief by prohibition or mandamus concerning the district court's decision not to appoint counsel for him. We also note that, while father asked for appointed counsel in the CHIPS case, he did not identify specific reasons why it would be appropriate that he have appointed counsel. While the CHIPS proceedings are relevant to this appeal, this appeal is from the district court's termination of parental rights and father was provided with appointed counsel in the TPR case.
Second, father's right to appointed counsel in the CHIPS case was not absolute. The statute provides an appointed-counsel right to a parent regardless of whether that parent is a party to the CHIPS case, but entrusts the district court to determine whether appointment of counsel is "appropriate." Minn. Stat. § 260C.163, subd. 3(c). We infer from a number of the district court's statements in the CHIPS file that, even if it had applied the correct statutory standard to father's request for appointed counsel in that case, it implicitly "felt" or determined that appointment of counsel for father was not appropriate. Id. As noted, father was incarcerated for significant periods of time and was repeatedly noncompliant with conditions of his probation in multiple criminal files-conditions that were similar to the components of his proposed (but unsigned) OHPP. Father was not meaningfully available as a potential safe placement for N.F. On this record, we cannot say that the district court would have abused its discretion had it determined that appointment of counsel for father in these circumstances would not have been "appropriate."
Finally, we are mindful that the best interests of N.F. are paramount here. Minn. Stat. § 260C.001, subd. 2(a) (2016). And timely permanency is a critical consideration for the wellbeing of maltreated children. R.D.L. , 853 N.W.2d at 134-35. N.F. has been placed out of home for nearly three years. Accordingly, and despite the district court's erroneous reasoning for not appointing counsel for father in the CHIPS file, we decline to reverse its termination of father's parental rights on this basis.
III. The record supports the district court's termination of father's parental rights.
Father argues that, despite his being incarcerated during most of the CHIPS case, he did not intend to abandon N.F.
*662 and the district court erred in finding that he abandoned N.F.
We will affirm the district court's termination of parental rights when a statutory ground for termination is supported by clear and convincing evidence, termination is in the best interests of the child, and the county has made reasonable efforts to reunite the family. In re Welfare of Children of S.E.P. , 744 N.W.2d 381, 385 (Minn. 2008). Parental rights may be terminated if the district court finds that "the parent has abandoned the child." Minn. Stat. § 260C.301, subd. 1(b)(1). "Abandonment requires: (1) actual desertion of the child, and (2) an intention to forsake the duties of parenthood." In re Children of Wildey , 669 N.W.2d 408, 414 (Minn. App. 2003), aff'd as modified , In re Welfare of Children of R.W. , 678 N.W.2d 49, 55 (Minn. 2004). "Under Minnesota caselaw, imprisonment alone is not sufficient to constitute abandonment." In re Children of Vasquez , 658 N.W.2d 249, 254 (Minn. App. 2003). Parental rights may be preserved if a parental relationship existed prior to incarceration, and if the imprisoned parent continued the relationship to the best of his ability while incarcerated through letters, cards, visits, and inquiries into the children's welfare. In re Welfare of Staat , 287 Minn. 501, 178 N.W.2d 709, 713 (1970). Imprisonment may combine with other factors, such as parental neglect and the withholding of parental affection, to support a finding of abandonment. Vasquez , 658 N.W.2d at 254.
A. The record supports the district court's determination that father abandoned N.F.
The district court found that father's incarceration was a significant, but not the sole, factor proving father's abandonment of N.F. Father was incarcerated at least six times in 2015, and from March 10 to August 30, 2016; October 2 to October 17, 2016; January 19 to March 18, 2017; and May 16 to October 29, 2017. The district court summarized the steps that father could have taken to mitigate a finding of abandonment. He could have completed mental-health and chemical-dependency evaluations. He could have met with the county social worker, signed an OHPP, and followed it. He could have worked with his probation officer to address the same issues that were part of his OHPP. He could have complied with probation terms to avoid further periods of incarceration. He could have refrained from demanding execution of his prison sentence and instead worked on his OHPP. He could have stayed in contact with the guardian ad litem and social worker to see how N.F. was doing and to have contact with N.F. through letters and cards. Father could have maintained a relationship with N.F. despite his incarceration. He did none of these things. Father had no meaningful contact with N.F. while incarcerated or during the few periods when he was not in jail or prison. See J.R.B. , 805 N.W.2d at 904-05 (affirming a determination that children were neglected and in foster care where children had been in court-ordered foster care for two years and father had not exercised consistent, meaningful visitation with the children while he was incarcerated).
The district court did not terminate father's parental rights solely because he was incarcerated, but expressly noted that father requested execution of a prison sentence when he instead could have worked on parenting. Father's choice rendered him unavailable to participate in the CHIPS case or be a father to N.F., evidencing an intention to forsake the duties of parenthood. The record supports the district court's findings. The district court did not abuse its discretion in finding that *663 father's repeated incarceration, combined with his lack of communication and involvement with N.F., constituted abandonment.
The record appears to us to support the district court's finding that other statutory grounds for termination were proved,[8] although a single statutory ground is sufficient to terminate parental rights. See K.S.F. , 823 N.W.2d at 663 ("[I]f after a hearing the court finds by clear and convincing evidence that one or more of the conditions set out in section 260C.301 exist, it may terminate parental rights."). We therefore do not review these other statutory grounds in detail, but note that the record appears to support them.
B. The district court's finding that the county made reasonable efforts to reunify N.F. with father is not clearly erroneous.
Father argues that the county did not make reasonable efforts to reunite him with N.F.[9] Specifically, father argues that the county's efforts to contact him while he was incarcerated were insufficient.
As discussed concerning mother, the district court must make the determination of reasonable efforts under Minn. Stat. § 260.012(h). "In some cases, any provision of services or further provision of services would be futile, and therefore unreasonable." In re Welfare of S.Z. , 547 N.W.2d 886, 892 (Minn. 1996). What constitutes "reasonable efforts" depends on the facts of each case. Id .
The district court found that the county informed father of the steps that he needed to take if he wished to reunify with N.F., including resolving the Order for Protection and submitting to random drug tests. The district court also found that the county had attempted to contact father by phone and by mail. The district court found father's lack of effort to take advantage of services that he was offered rendered the county's efforts futile.
Based on this record, any efforts that the county made or attempted were disrupted by father's repeated periods of incarceration. At the beginning of the proceedings, father attended hearings and called the county to set up visits. The county did set up several visits for father, but these meetings never came to fruition because father was incarcerated. The county's efforts, although imperfect, were reasonable under the circumstances. The records supports the district court's finding that the county made reasonable efforts.
C. The district court did not abuse its discretion in finding that termination of father's parental rights is in N.F.'s best interests.
Father argues that the district court abused its discretion in finding that N.F.'s best interests favor terminating father's parental rights. Specifically, father argues that he has a great interest in preserving the parent-child relationship and that, if N.F. were returned to father's care, N.F. will live near other family members in a culturally appropriate lifestyle.
*664 The best-interests analysis is flexible and weighs competing factors in addressing a child's best interest, including a parent's interest in continuing to parent his child and the benefit to the child from continuing ties with his birth parents and their culture. See In re Welfare of Child of S.S.W. , 767 N.W.2d 723, 731 (Minn. App. 2009) (stating that determining a child's best interests involves consideration of "the child's unique circumstances and individual needs," citing multiple statutory standards on best interests). The best-interests analysis also allows the district court to decide that the child's need for a safe, stable environment outweighs the pull of parental affection or cultural ties.
The record supports the district court's findings that the best interests of N.F. weigh in favor of terminating of father's parental rights. Father has not had consistent contact with N.F. since these proceedings began and was not the custodial parent when the CHIPS petition was filed. There is no record evidence to indicate that N.F. has a strong bond with father. To the contrary, the record consistently reveals the absence of any significant emotional attachment to father. While father argues that it would be in N.F.'s best interests to return the child to father so that N.F. can form relationships with other relatives, the record does not support that N.F. had a significant bond with other relatives. The district court acted within its discretion in finding that it is in N.F.'s best interests to terminate father's parental rights.
DECISION
Under Minn. Stat. § 260C.163, subd. 3(c), each parent in a CHIPS proceeding shall be appointed counsel if the parent cannot afford counsel and the district court feels that appointment of counsel is appropriate. The district court's error of law concerning father's right to counsel in the CHIPS file does not require reversal in this TPR proceeding. The record supports the district court's determinations of statutory grounds to terminate the parental rights of both parents and the district court acted within its discretion in terminating parental rights.
Affirmed.

Minn. Stat. § 260C.163 was reorganized in 2017. In 2016, the relevant portion of the statute states that "if the child, parent, guardian, or custodian desires counsel, but is unable to employ it, the court shall appoint counsel ... in any case in which it feels that such an appointment is appropriate." Minn. Stat. § 260C.163, subd. 3(b) (2016). In the 2017 Supplement, the statute was reorganized and some of the language in subdivision 3(b) was moved to subdivision 3(c). The 2017 Supplement states that "if the parent, guardian, or custodian desires counsel but is unable to employ it, the court shall appoint counsel to represent the parent, guardian, or custodian in any case which it feels that such an appointment is appropriate." Minn. Stat. § 260C.163, subd. 3(c) (Supp. 2017). The 2017 Supplement also provides that "[c]ourt appointed counsel shall be at county expense as outlined in paragraph (h)." Id ., subd. 3(h) (Supp. 2017). The "feels appropriate" language we address in this opinion is unchanged by the reorganization. Therefore, we cite the current version of the statute in this opinion. See Interstate Power Co. v. Nobles Cty. Bd. of Comm'rs , 617 N.W.2d 566, 575 (Minn. 2000) ("The general rule is that appellate courts apply the law as it exists at the time they rule on a case.").

In this appeal, father does not challenge that, in the CHIPS case, he neither admitted the petition nor had a trial on the CHIPS petition.

Neither of father's requests to intervene as a party were preceded by a formal motion.

Oral arguments in this case were heard on September 12, 2018. Father's counsel argued for both mother and father because mother's counsel was ill.

Father's counsel also conceded, at oral argument, that there is no record evidence to support father's claim. We appreciate counsel's candor on this point.

The legislature's use of the verb "to feel" is unusual, but we take the statute as we find it. In context, we understand the verb to have the meaning: "To be persuaded of" or "To believe; think." The American Heritage Dictionary of the English Language 647 (5th ed. 2011).

Child-protection proceedings are typically expedited "for the best interests of children who are in need of protection." R.D.L. , 853 N.W.2d at 134. The district court permitted N.F.'s foster-care placement to continue beyond the typical 12-month maximum in order to accommodate the county's efforts to reunify N.F. with mother.

The district court also found that father "has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship" and "that [N.F.] is neglected and in foster care."

The county does not argue on appeal that reasonable efforts to reunify N.F. with father were not necessary because of the abandonment finding. And, as noted, the district court's termination of father's rights was based on the county's proof of multiple statutory grounds.