*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0931**

In the Matter of the Welfare of the Children of: N. L. and B. Y., Parents.

**Filed December 11, 2023
Affirmed
Johnson, Judge**

Redwood County District Court
File No. 64-JV-23-1

Brooke Beskau Warg, Hennepin County Adult Representation Services, Minneapolis, Minnesota (for appellant-mother N.L.)

Jenna M. Peterson, Redwood County Attorney, Redwood Falls, Minnesota; and

Travis J. Smith, Special Assistant County Attorney, Slayton, Minnesota (for respondent Southwest Health and Human Services)

Shanna Latterell, Marshall, Minnesota (guardian *ad litem*)

Considered and decided by Larkin, Presiding Judge; Johnson, Judge; and Frisch, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

The district court terminated a woman's parental rights to four children. We conclude that the district court did not err by finding that the county made reasonable efforts to reunite her with the children or by finding that the petitioner proved a statutory ground for termination. Therefore, we affirm.

**FACTS**

N.L. is the biological mother of four minor children: K.F.Y., who was born in August 2012; B.S.Y., who was born in June 2014; Z.N.Y., who was born in November 2015; and K.L.Y., who was born in July 2019.

In July 2021, law-enforcement officers conducted a warranted search of a rural home near the city of Walnut Grove, where N.L. lived with the four children and their biological father, B.Y. The officers found a variety of contraband, including loaded and unloaded firearms, ammunition, methamphetamine, and unknown pills. Both N.L. and B.Y. were charged with criminal offenses, including unlawful possession of firearms and controlled substances.

The matter was reported to Southwest Health and Human Services (SWHHS), a health-and-human-services agency serving multiple counties in southwest Minnesota. SWHHS met with N.L. and B.Y. to discuss the welfare of their children, but the parents were uncooperative. SWHHS social workers documented several unsuccessful attempts to work with the parents voluntarily between October 2021 and March 2022.

On March 25, 2022, SWHHS petitioned the district court for a determination that the children were in need of protection or services (CHIPS). SWHHS obtained hair-follicle samples from the four children on April 8, 2022, which indicated that three of the children had "extremely high levels of amphetamine and methamphetamine." At an emergency-protective-care hearing on April 12, 2022, the district court ordered that the children be placed in foster care.

On April 19, 2022, the district court ordered the parents to follow case plans. N.L. signed four case plans—one for each child—in late May 2022. N.L.'s case plans included five areas of need: chemical health, mental health, parenting education, home environment, and visitation/parenting time.

The district court held an intermediate-disposition hearing in late May 2022. The district court ordered that legal custody of the children remain with SWHHS for placement in a licensed foster-care home. The district court allowed N.L. and B.Y. to have supervised visits with the children.

Between April and June of 2022, N.L. attended some supervised visits with the children at a visitation center but was late on 13 occasions and did not show up on several other occasions. In addition, the children reacted negatively after the visits with N.L. The visitation center suspended both parents' visits on July 6, 2022, because they continually violated the center's policies. The district court later granted SWHHS's motion to suspend N.L.'s right to supervised visits.

On October 4, 2022, the district court held a permanency-progress-review hearing. The district court found that N.L. had not made progress on her case plan and that the permanency deadlines should not be extended. The district court ordered SWHHS to file a permanency petition.

The next day, N.L. began an intensive outpatient substance-abuse treatment program at Club Recovery. But she stopped attending treatment a few weeks later and was discharged from the program. On November 28, 2022, N.L. started a chemical-dependency

treatment program and parenting classes at the Healing House. She remained there until she and SWHHS learned that it was not a licensed treatment facility.

On January 6, 2023, SWHHS petitioned for the termination of N.L.'s and B.Y.'s parental rights. SWHHS alleged five statutory grounds for termination. *See* Minn. Stat. § 260C.301, subd. 1(b)(1), (2), (4), (5), (8) (2022). Before trial, B.Y. stipulated to the voluntary termination of his parental rights.

The case was tried on three days in April 2023. SWHHS called seven witnesses, including N.L. In May 2023, the district court filed a 41-page order in which it found that SWHHS had proved four statutory grounds for termination, that SWHHS had made reasonable efforts to reunite N.L. with the children, and that termination of her parental rights was in the children's best interests. Accordingly, the district court granted SWHHS's petition and terminated N.L.'s parental rights to all four children. N.L. later filed a motion for amended findings or a new trial, which the district court denied. N.L. appeals.

## DECISION

N.L. argues that the district court erred by granting SWHHS's petition and terminating her parental rights. She raises three issues.

This court reviews an order terminating parental rights "to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "Parental rights are terminated only for grave and weighty reasons," *In re Welfare of M.D.O.*, 462 N.W.2d 370,

375 (Minn. 1990), but this court gives "considerable deference to the district court's decision to terminate parental rights," *S.E.P.*, 744 N.W.2d at 385.

We apply a clear-error standard of review to a district court's findings of historical fact and an abuse-of-discretion standard of review to a district court's determinations concerning the existence of statutory grounds for termination, the children's best interests, and the ultimate decision to terminate parental rights. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *rev. denied* (Minn. Jan. 6, 2012); *In re Welfare of Child of A.M.C.*, 920 N.W.2d 648, 657 (Minn. App. 2018).

## I. Reasonable Efforts

We begin by considering N.L.'s argument that the district court erred by finding that SWHHS made reasonable efforts to reunite N.L. with the children.

After a CHIPS adjudication, a social-services agency "shall ensure that reasonable efforts . . . are made to prevent placement or to eliminate the need for removal and to reunite the child with the child's family at the earliest possible time." Minn. Stat. § 260.012(a) (2022). In a proceeding to terminate parental rights, the district court "shall make specific findings . . . that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made including individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." Minn. Stat. § 260C.301, subd. 8(1). In determining whether a social-services agency made reasonable efforts, the district court "shall consider" various statutory factors. Minn. Stat. § 260.012(h) (2022). The reasonable efforts required of a county social service agency depend on the facts and circumstances of the case. *See In re*

*Children of T.A.A.*, 702 N.W.2d 703, 709 (Minn. 2005); *A.M.C.*, 920 N.W.2d at 663. This court applies a clear-error standard of review to a finding that a county made reasonable efforts to reunite a parent with a child. *See S.E.P.*, 744 N.W.2d at 387.

N.L.'s first argument has three parts, which we address in turn.

**A.**

N.L. first contends that the district court erred by discussing the reasonable-efforts issue in the memorandum attached to its order, not in the body of the order. N.L. does not cite any caselaw for the proposition that it is improper for a district court to do so. We are aware of caselaw stating that a district court's reasons for its decision may be expressed in a memorandum that is attached to an order, so long as the memorandum is made part of the order. *See, e.g.*, *Merriman v. Sandeen*, 267 N.W.2d 714, 716 n.5 (Minn. 1978); *Viking Automatic Sprinkler Co. v. Viking Fire Prot. Co.*, 159 N.W.2d 250, 256 (Minn. 1968); *Anderson v. Jennie*, 80 N.W.2d 41, 42-44 (Minn. 1956). Even if a memorandum is not made part of an order, an appellate court may refer to the memorandum "for the purpose of throwing light upon or explaining a decision." *Merriman*, 267 N.W.2d at 716 n.5; *see also Sieren v. American Family Fin. Srvcs., Inc.*, 356 N.W.2d 408, 410-11 (Minn. App. 1984), *rev. denied* (Minn. Feb. 6, 1985); *cf.* Minn. R. Civ. P. 52.01 & 1985 advisory comm. note (permitting findings of fact and conclusions of law "in an accompanying memorandum"). In this case, the district court's order concludes with the following statement: "The attached memorandum is incorporated herein by reference." The district court did not err by discussing the reasonable-efforts issue in the memorandum attached to its order.

**B.**

N.L. also contends that the district court erred on the ground that its findings related to SWHHS's efforts are lacking in specificity. N.L. focuses on this paragraph:

> In the present case, given the needs of the parent and children, the efforts expended by SWHHS were reasonable and were specifically directed at correcting the conditions leading to children's placement. Mother has struggled with methamphetamine addiction, and the treatment and random testing were attempts to provide her with the resources and accountability necessary to obtain and retain sobriety. She often curtly denied or specifically ignored numerous attempts at testing, and actively resisted appropriate treatment opportunities. Similarly, parent education, therapy and parenting classes were directed specifically at parenting deficiencies (particularly supervision) necessary to safely parent these children. Her failure to engage in treatment frustrated these opportunities. The additional supportive services (foster care, financial assistance, supervised parenting time, and others) were intended to remove barriers the parents might experience in accessing more important services - making them more realistic, available and accessible. The services provided to mother were "reasonable efforts."

The paragraph identified by N.L. is merely a summary of the district court's discussion of the reasonable-efforts issue. In its order, the district court wrote 164 paragraphs of findings of fact spanning 24 pages. Many of those findings describe SWHHS's efforts to assist N.L. in complying with her case plan and in being reunited with the children. More specifically, the district court's findings describe SWHHS's efforts to help N.L. obtain treatment, participate in a parenting program, complete home inspections, and engage in supervised visits with the children. Considering the order and memorandum as a whole, the district court did not fail to make "specific findings . . . that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or

7

to make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." *See* Minn. Stat. § 260C.301, subd. 8(1).

## C.

N.L. further contends that, for three reasons, the district court erred by finding that SWHHS made reasonable efforts.

First, N.L. contends that "SWHHS failed to ensure Mother's home was safe and suitable for her and her children as required under the case plan or, alternatively, assist her in finding suitable housing." In response, SWHHS contends that it was N.L.'s responsibility—not the agency's—to do the work necessary to clean her home so that the children could return.

N.L.'s case plan required her to "maintain stable, clean, and sober housing free from any hazardous or dangerous items." The district court found that a SWHHS social worker coordinated with N.L. to schedule an environmental consultant's inspection of her home, which found the presence of methamphetamine residue in ten locations. The district court also found that SWHHS personnel visited N.L.'s residence in late June 2022 for a follow-up inspection, during which N.L. said that she did not intend to do additional cleaning because she intended to sell the home. These findings are supported by the social worker's testimony and by SWHHS's exhibits. The district court did not clearly err by finding that SWHHS made reasonable efforts to assist N.L. in complying with the requirement that she maintain a home free of the hazards of methamphetamine residue.

Second, N.L. contends that "SWHHS failed to assist [her] in finding a treatment center that would allow her children to stay with her in later stages of the case." In response, SWHHS contends that it had no obligation to find such a treatment facility while N.L.'s supervised visits were suspended.

N.L.'s case plan required her to undergo a chemical-dependency assessment and follow its recommendations. The case plan states that SWHHS would "make referrals as needed, discuss recommendations and any barriers," and "discuss solutions and assist [N.L.] to work around the concerns." The district court found that N.L. completed a comprehensive chemical-use assessment, which resulted from SWHHS's referral. The district court also found that SWHHS discussed with N.L. the need and options for treatment on at least six occasions. These findings are supported by the social workers' testimony and case notes. The evidence does not show that SWHHS assumed an obligation to find a treatment facility that would allow the children to live with N.L. N.L.'s supervised visits with the children were suspended after September 2022, except for one visit by videoconference in January 2023, after which supervised visits again were suspended. As SWHHS argues, because N.L. did not have a right to visit the children during the relevant time period, there would have been no value in the type of facility N.L. describes in her brief.

Third, N.L. contends that "SWHHS failed to timely advise mother that the treatment facility she chose was inadequate and then assist [her] in finding another treatment facility." In response, SWHHS contends that N.L. disregarded SWHHS's recommended treatment providers and insisted on finding her own treatment providers. SWHHS further

9

contends, and the district court found, that SWHHS learned that the Healing House is unlicensed at the same time that N.L. learned of that fact. The district court's finding is supported by the testimony of the social-work supervisor, who testified that Healing House's unlicensed status became apparent when she visited N.L. there in March 2023. She also testified that SWHHS made efforts to help N.L. obtain treatment before then, such as by contacting treatment facilities and talking with N.L. about returning to inpatient treatment.

In sum, the district court did not err by finding that SWHHS made reasonable efforts to reunite N.L. with the children.

## II. Statutory Grounds for Termination

We continue by considering N.L.'s argument that the district court erred by finding that the county proved four statutory grounds for the termination of her parental rights. We begin with the second ground identified by the district court, that "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child[ren]'s placement." *See* Minn. Stat. § 260C.301, subd. 1(b)(5).

The district court noted that N.L.'s case plan focused on "five primary areas of need: (a) chemical health; (b) mental health; (c) parenting education; (d) home environment; and (e) visitation/parenting time." The district court made 55 paragraphs of findings of fact concerning N.L.'s compliance with her case plan with respect to the five primary areas of need. Specifically, the district court found that N.L.'s goals with respect to her mental health were "partially met" and that her goals with respect to the other four areas were not met.

10

N.L. first contends that SWHHS did not make reasonable efforts to reunite her with the children. But we have concluded that SWHHS made such efforts. *See supra* part I.

N.L. also contends that the conditions that led to the out-of-home placement "have been addressed." She argues that the district court overlooked evidence that she had participated in treatment programs and had not tested positive for controlled substances during the four-and-one-half-month period preceding trial. The district court found that N.L.'s last positive test result was in November 2022. The district court also found that N.L. had not completed a chemical-dependency treatment program and that, only three weeks before trial, she had started a new program that would require four to five months to complete. The district court concluded that N.L. "has failed to meaningfully address her obvious and severe chemical abuse." These findings are supported by the evidence.

N.L. also asserts that she had made some progress in therapy and in a parenting-education course. The district court acknowledged her progress. But her progress was not enough to avoid a finding that the conditions that led to the children's out-of-home placement had not been corrected.

N.L. further contends the evidence does not support the district court's finding that she had not addressed the methamphetamine contamination of her home. She cites her testimony that she did the required cleaning and that SWHHS representatives had not inspected the home to confirm her remediation work. The April 19, 2022 court order required N.L. to "open [her] home to SWHHS to address any environmental hazards and comply with an in-home inspection to ensure there is no controlled substance residue in the home." The environmental report summarizing the inspection required "whole-house

11

ventilation system remediation" and stated that the "HVAC system should be cleaned thoroughly by professional personnel." At trial, N.L. initially testified that she personally cleaned the ventilation ducts but, two days later, testified that she hired a professional cleaning company to clean the ducts, without informing SWHHS that she had hired the company. A SWHHS social worker testified that the ducts and furnace had not been cleaned. Thus, the district court's finding that N.L. did not complete the required remediation is supported by the evidence.

N.L. makes no argument that the fifth condition—described in the district court's order as "visitation/parenting time"—was corrected.

N.L. further contends that the district court erred by relying too much on her past history and not enough on the conditions that existed at the time of trial. She asserts that a district court should rely "not primarily on past history, but to a great extent upon the projected permanency of the parent's inability to care for his or her child." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996) (quotations omitted). That statement in the *S.Z.* opinion was made in the context of a review of a district court's finding of palpable unfitness. *Id.* The statutory ground at issue here—that reasonable efforts have failed to correct the conditions that led to the child's out-of-home placement—is different and is inherently focused on the conditions as they existed at the time of trial. Furthermore, the district court's findings are appropriately focused on N.L.'s situation as it existed at the time of trial. The district court referred to N.L.'s past history only in limited ways, as necessary to put N.L.'s current status in context.

12

We acknowledge our recent nonprecedential opinion in *In re Welfare of Child of T.R.T.*, No. A22-0539, 2022 WL 9613322 (Minn. App. Oct. 17, 2022), in which we reversed the termination of the appellant's parental rights and remanded for further proceedings on the ground that the district court erred in determining that adverse conditions would continue for a prolonged, indeterminate period. *Id.* at *10. The evidence in that case was meaningfully different from the evidence in this case for several reasons. The appellant in *T.R.T.* had fully completed all parts of her case plan; she had completed a chemical-dependency evaluation, inpatient treatment, and outpatient aftercare. *Id.* at *6. In this case, however, N.L. has not completed any of the five main parts of her case plan. In addition, N.L. has failed to correct additional conditions that were not present in *T.R.T.*, namely, the unsafe conditions of her home and her lack of parenting skills. Accordingly, we reach a different conclusion than in *T.R.T.*

Thus, the district court did not err by determining that reasonable efforts had failed to correct the conditions that led to the out-of-home placement.

A district court may terminate parental rights based on the existence of only one statutory ground for termination. *See* Minn. Stat. § 260C.301, subd. 1(b). Likewise, an appellate court may affirm "if at least one statutory ground alleged in the petition is supported by clear and convincing evidence." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). Having concluded that the district court did not err by finding that reasonable efforts had failed to correct the conditions that led to the out-of-home placement, we need not consider N.L.'s challenges to the district court's conclusions on the three other statutory grounds.

## III. Conversion to CHIPS

N.L. last argues that the district court erred by not converting the permanency case to a CHIPS case. She relies on the following statute:

> If, after a hearing, the court does not terminate parental rights but determines that the child is in need of protection or services, or that the child is neglected and in foster care, the court may find the child is in need of protection or services or neglected and in foster care and may enter an order in accordance with the provisions of section 260C.201.

Minn. Stat. § 260C.312(a) (2022). She also cites the following procedural rule:

> If the court finds that the statutory grounds set forth in the petition are not proved, the court shall either dismiss the petition or determine that the child is in need of protection or services. If the court determines that the child is in need of protection or services, the court shall either enter or withhold adjudication pursuant to Rule 50 and schedule further proceedings pursuant to Rule 51. If the court finds that one or more statutory grounds set forth in the termination of parental rights petition are proved, the court may terminate parental rights.

Minn. R. Juv. Prot. P. 58.04(c)(1).

N.L.'s argument fails because it depends on a condition precedent that is not satisfied. Both the statute and the rule provide that a district court may convert a termination case to a CHIPS case *if* the district court has not granted the termination petition. Neither the statute nor the rule authorizes a district court to convert a termination case to a CHIPS case if a petitioner has proved statutory grounds for termination and the district court has terminated parental rights. Because the district court in this case found that SWHHS proved four statutory grounds and granted its termination petition, the district court did not have authority to convert the case to a CHIPS case.

14

In sum, the district court did not err by granting SWHHS's petition and terminating N.L.'s parental rights.

**Affirmed.**