*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0177**

In the Matter of the Welfare of the Child of: J. J. S. I., Parent.

**Filed September 2, 2025
Affirmed
Reyes, Judge**

Hennepin County District Court
File No. 27-JV-23-2280

Anne M. Carlson, St. Paul, Minnesota (for appellant father J.J.S.I.)

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services Department)

Eric Richard, Brooklyn Center, Minnesota (for respondent mother A.X.V.M.)

David Yates, Minneapolis, Minnesota (for guardian ad litem)

Considered and decided by Worke, Presiding Judge; Reyes, Judge; and Reilly, Judge.[*]

**NONPRECEDENTIAL OPINION**

**REYES**, Judge

Appellant-father challenges the district court's order terminating his parental rights, arguing that it abused its discretion when it determined that (1) he committed egregious

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

harm; (2) he is palpably unfit to parent; and (3) terminating his parental rights was in child's best interests. We affirm.

## FACTS

Father and A.X.V.M. are the parents of Child 1, who was five years old at the time of trial. When they met in 2018 working at the same McDonald's, A.X.V.M. had two children, Child 2 and Child 3, who were nine and twelve years old at the time of trial. Father and A.X.V.M. began dating in May 2018 and shortly after, he moved into A.X.V.M.'s two-bedroom apartment where she lived with Child 2 and Child 3.[1] A.X.V.M. gave birth to Child 1 in June 2019. When father and A.X.V.M. lived together, A.X.V.M. worked the overnight shift, and father cared for all three children overnight. Father and A.X.V.M.'s relationship ended in November 2021 after an argument between them. Father moved out of the apartment. As a result of the argument, A.X.V.M. filed for an order for protection against father, which was ultimately dismissed.

A.X.V.M. and father reached an agreement on custody and parenting time of Child 1, and in April 2023, they tried to rekindle their relationship. The relationship ended in early July 2023 after A.X.V.M. learned that Child 3 told a neighbor that father inappropriately touched them. A.X.V.M. confronted Child 3 about this, and Child 3 eventually told A.X.V.M. what happened.

---

[1] Child 2 and Child 3 have the same father, who they see regularly, but they primarily reside with A.X.V.M.

In a forensic interview at CornerHouse,[2] Child 3 stated that, when father lived with them and A.X.V.M. was working overnight, father came into the bedroom that Child 3 shared with Child 2 and asked Child 3 to come with him into the room that he shared with A.X.V.M. and Child 1. Child 3 stated that father told them to remove their clothes and get on the bed and then touched their bare breasts, stomach, and vagina. Child 3 noted that Child 1 was asleep in the bedroom during the incident. Father denies this happened.

Respondent Hennepin County Human Services Department (the county) made a maltreatment finding against father and in August 2023 petitioned to terminate his parental rights to Child 1. The district court appointed a guardian ad litem (GAL) to represent Child 1's interests. The district court relieved the county of having to make reasonable efforts to rehabilitate and reunify father with Child 1 because its petition stated a prima facie case that father subjected a child to egregious harm. Still, the county created a case plan for father, which required him to (1) have no contact with A.X.V.M.'s children and no contact with Child 1 until the district court permitted contact; (2) complete a psychosexual evaluation and follow all recommendations and remain law abiding; and (3) cooperate and stay in contact with the county. Father mostly complied with the case plan, but was not forthcoming with information in his psychosexual evaluation and did not pursue therapy, which the evaluator recommended. The evaluator described father's approach to the psychosexual evaluation as "defensive" and noted "inconsistencies" in his answers. While

---

[2] "CornerHouse is a private independent agency that interviews victims of alleged child abuse who are referred from child protection and law enforcement." *State v. Goldenstein*, 505 N.W.2d 332, 337 (Minn. App. 1993), *rev. denied* (Minn. Oct. 19, 1993).

the evaluator stated that "nothing in [father]'s history that indicates he is a danger to his [child] or should be restricted from contact with [the child]," she could not complete all of the assessments because she lacked information about father's criminal history.[3]

A two-day bench trial began in October 2024. The county presented testimony from Child 3; a child-protection investigator for Hennepin County (the child-protection investigator); A.X.V.M.; a child protection social worker for Hennepin County Children's Services (the social worker); and expert testimony from William Koncar, a forensic interviewer at CornerHouse who interviewed Child 3. Father testified, as did the GAL. The district court also reviewed several exhibits, including Child 3's interview at CornerHouse, an interview with Child 2, father's psychosexual evaluation, and the criminal complaint charging father with second-degree criminal sexual conduct.

The district court terminated father's parental rights, determining that the county presented clear and convincing evidence of both egregious harm and father's palpable unfitness, and that termination was in Child 1's best interests. The district court denied father's motion for a new trial and amended findings.

This appeal follows.

## DECISION

A parent's child "should not be taken from them but for grave and weighty reasons" because natural parents are presumed to be fit and suitable to care for their child. *In re Welfare of Child of K.L.W.*, 924 N.W.2d 649, 653 (Minn. App. 2019). There are, however,

---

[3] The State of Minnesota charged father with second-degree criminal sexual conduct for the incident with Child 3 but later dismissed the charge.

several statutory bases under which a person's parental rights may be terminated. *See* Minn. Stat. § 260C.301, subd. 1 (2024).[4]  "[A] district court may only involuntarily terminate parental rights if at least one statutory basis for termination exists and it finds that termination is in the child's best interests." *K.L.W.*, 924 N.W.2d at 653.  The best interests of the child are the "paramount consideration" in a termination proceeding.  Minn. Stat. § 260C.301, subd. 7 (2024); *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012).  District courts have "considerable deference" in their decision to terminate parental rights.  *In re Welfare of Child of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).  This is because they "stand in a superior position to appellate courts in assessing the credibility of witnesses." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 374-75 (Minn. 1990).

When reviewing a district court's termination of parental rights, appellate courts review whether a district court's findings address the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous. *S.E.P.*, 744 N.W.2d at 385; *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).  We review the "determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *K.L.W.*, 924 N.W.2d at 653 (quotation omitted).  A district court abuses its discretion when its findings of fact are clearly erroneous. *See Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997) (applying standard

---

[4] This statute was amended and renumbered effective August 1, 2024.  All cites to the statute in this in this opinion reflect the current numbering of the statute.  *Compare* Minn. Stat. § 260C.301, subd. 1 (2024) *with* Minn. Stat. § 260C.301, subd. 1 (2022).

to spousal maintenance); *Peterka v. Peterka*, 675 N.W.2d 353, 360 (Minn. App. 2004) (district court did not abuse its discretion when it "resolved the issue in a logical manner consistent with the facts on the record."). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted).

I. **The district court did not abuse its discretion by determining that father engaged in egregious harm because its findings are supported by the record and are not clearly erroneous.**

Father argues that the district court abused its discretion when it found that he committed egregious harm against Child 3 because Child 3's claim of abuse is "unsubstantiated" and "false"; "the court did not receive evidence related to [his] present ability to care for Child 1"; there was no evidence "that the conduct alleged by Child 3 . . . impacted Child 1 in a negative way"; and his alleged conduct towards Child 3 "was not of any duration or chronicity to support the [district] court's finding of egregious harm" because the alleged event occurred just once. We are not persuaded.

A statutory basis to terminate a person's parental rights exists if the district court determines:

> that a child has experienced egregious harm in the parent's care that is of a *nature, duration, or chronicity* that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

6

Minn. Stat. § 260C.301, subd. 1(b)(5) (emphasis added).[5]

The district court thoroughly detailed why it believed the evidence supported a determination of egregious harm. First, the district court found the county's witnesses, which included Child 3, A.X.V.M., Koncar, the child-protection investigator, and the social worker, credible and persuasive. It also found the GAL's testimony to be "credible, informed, and persuasive."

Second, the district court found father "minimally credible" and that his "testimony was largely contradicted by other credible testimony." The district court noted that father "consistently testified in a manner that presented himself in an overly positive light, did not demonstrate his ability to safely parent Child 1 in the reasonably foreseeable future, and focused mainly on himself."

Third, the district court accurately detailed the testimony of each witness with cites to the record.

Fourth, the district court found that the county presented "substantial evidence that demonstrated by clear and convincing evidence that [father] sexually abused Child 3." This included testimony from Child 3 describing the abuse and how they were afraid to tell anyone about it because father warned them not to do so; A.X.V.M.'s testimony that she confronted Child 3 about the sexual abuse after learning about it from her neighbor, and

---

[5] Egregious harm "means the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care" and includes "conduct toward a child that constitutes criminal sexual conduct under sections 609.342 to 609.345." Minn. Stat. § 260C.007, subd. 14(10) (2024). Notably, father does not argue that his alleged conduct towards Child 3 does not fall under the statutory definition of egregious harm.

that when she and father rekindled their relationship, Child 3 "did not want to be close to or around him"; Child 2's interview that father came into the room that Child 2 shared with Child 3 one night, asked Child 3 to come with him, Child 3 went with him, and when Child 3 returned to their bedroom they refused to tell Child 2 what happened; Child 3's interview at CornerHouse during which they detailed the abuse and provided essentially the same description as they did at trial; and Koncar's testimony explaining that discrepancies in Child 3's ability to specify the exact time of when the abuse occurred was not unusual for victims of abuse.

Fifth, the district court also found that the county, while not required to do so, offered father a case plan; that his responses to the psychosexual evaluation were "defensive" making "the results of this case plan component [] invalid"; that he did not engage in individual therapy even though this would have been advantageous for Child 1; and that he "has not engaged in any services outside of the [county]'s voluntary case plan to demonstrate his ability to safely parent Child 1 despite him abusing Child 3."

Additionally, father's argument that his "alleged conduct towards Child 3 was not of any duration or chronicity to support the court's finding of egregious harm" because the "alleged conduct" occurred only once is not supported by the plain language of the statute or caselaw. First, the statute does not limit a finding of egregious harm only to those harms that are of a particular duration or chronicity; a plain reading of the statute demonstrates that the *nature* of the harm can also be sufficient. Minn. Stat. § 260C.301, subd. 1(b)(5) ("[A] child has experienced egregious harm in the parent's care that is of a nature, duration or chronicity that indicates a lack of regard for the child's well-being . . ."). Second, in *In*

8

*re Welfare of A.L.F.*, we upheld a district court's finding of egregious harm based on a single incident in which the parent severely injured a child who was in their care, but was not their biological child. 579 N.W.2d 152, 154, 156 (Minn. App. 1998).

We conclude that district court did not abuse its discretion by determining that father engaged in egregious harm because its detailed factual findings are supported by the record and are not clearly erroneous.[6]

## II. The district court did not abuse its discretion by determining that it was in Child 1's best interests to terminate father's parental rights.

Father argues that the district court abused its discretion when it determined that terminating his parental rights was in Child 1's best interests because it "failed to give" his interests "adequate weight," noting his desire to maintain a relationship with Child 1, and it "did not receive evidence that Child 1 does not enjoy time spent with [f]ather." We are not persuaded.

District courts analyze three factors when making best-interests determinations: (1) the child's interest in preserving the parent-child relationship"; (2) "the parent's interest in preserving the parent-child relationship"; and (3) "any competing interests of the child." Minn. R. Juv. Prot. P. 58.04(c)(2)(ii); *see also K.L.W.*, 924 N.W.2d at 656. "Competing interests include such things as a stable environment, health considerations and the child's

_____

[6] Because we conclude that the district court's determination of egregious harm is supported by the record, we need not consider appellant's argument regarding the district court's determination on palpable unfitness. *See K.S.F.*, 823 N.W.2d at 665 ("We defer to the district court's decision on termination *if at least one statutory ground for termination is supported by clear-and-convincing evidence* and termination is in the children's best interests." (emphasis added)).

preferences." *K.S.F.*, 823 N.W.2d at 668 (quotations omitted).  Appellate courts review a district court's best-interests determination for an abuse of discretion.  *K.L.W.*, 924 N.W.2d at 656.  A district court abuses its discretion when its decision is against logic or the district court's uncontested factual findings.  *In re Welfare of A.M.C.*, 920 N.W.2d 648, 660 (Minn. App. 2018).  An appellate court can affirm a district court's decision to terminate parental rights when at least one statutory ground for termination is supported by clear and convincing evidence, and termination is in the best interests of the child, and, either the county made reasonable efforts to reunite the family, or those efforts were not required. *S.E.P.*, 744 N.W.2d at 385 (citations omitted); *see* Minn. Stat. § 260.012(a)(1) (2024) (noting that reasonable efforts are not required if the petition to terminate parental rights makes a prima facie case that egregious harm is present).

The district court found that the factors favored termination.  On the first factor, the district court relied on testimony from the GAL and the social worker that (1) Child 1 does not ask about father; (2) father is a risk to Child 1; and (3) there had been no contact between father and Child 1 for approximately a year-and-a-half.  The GAL and social worker also noted that Child 1 is well cared for by A.X.V.M.

The district court's analysis on the second factor encompasses factors two and three. The district court acknowledged father's interest in maintaining a parent-child relationship with Child 1.  However, it noted that father's "action of committing the abuse against Child 3 and the manner in which he has responded to it do not support this interest."  The district court pointed to father's failure to acknowledge his abuse of Child 3 despite clear and convincing evidence to the contrary or the trauma the abuse has had on Child 1 and their

10

siblings. The district court found that termination of father's parental rights was in Child 1's best interests.

The district court carefully analyzed the best-interests factors, mindful that Child 1's interests were "paramount." *M.D.O.*, 462 N.W.2d at 378. Because the district court's findings are supported by the record, it did not abuse its discretion when it weighed the appropriate factors and determined that they favored terminating father's parental rights. *See A.M.C.*, 920 N.W.2d at 660.

**Affirmed.**